**UNITED STATES of America**

v.

**Robert H. DAVIS, Appellant.**

**UNITED STATES of America**

v.

**George D. GELESTINO, Appellant.**

**Nos. 78–2246, 78–2247.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 30, 1979.

Decided Oct. 26, 1979.

Rehearing Denied March 7, 1980.

Richard A. Rosen, Washington, D.C., with whom Silas J. Wasserstrom, Washington, D.C., was on brief, for appellant in No. 78–2247.

Stuart Stiller, Washington, D.C., with whom Barbara Kammerman, Washington, D.C., was on brief, for appellant in No. 78–2246.

H. Lowell Brown, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., Washington, D.C., at the time the brief was filed, John A. Terry, Peter E. George, and Joseph F. McSorley, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Margaret Ellen, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellee.

Before TAMM and MacKINNON, Circuit Judges, and AUBREY E. ROBINSON, Jr.,* United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In these related cases, consolidated for appeal, the appellants challenge their separate convictions of various charges related to illicit traffic in cocaine. Each maintains that police misconduct induced him to make self-incriminating statements that later were used against him at trial. Appellant Davis also asserts that admission of tangible evidence obtained in a search of his house was improper, and Appellant Gelestino adds to his arguments for exclusion of statements a claim under Federal Rule of Criminal Procedure 11(e)(6). We affirm the convictions.

## I. THE FACTS

In March of 1978, information gleaned from undercover work led officers of the

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

Metropolitan Police Department in Washington, D.C., to believe that cocaine traffic was originating from apartment 31, 1848 Columbia Road, N.W., in the District of Columbia.[1] On the evening of March 22, a police party that included, among others, Sergeant Raymon N. Gonzales, Officer Patricia Williams, and Assistant United States Attorney C. Madison Brewer entered the apartment and there arrested Appellant Gelestino and his girlfriend, Sali Dimond. At the time, the police had neither an arrest warrant nor a search warrant.

The officers and Brewer quickly concluded that Gelestino was not a primary supplier of cocaine and sought his help in identifying his "source." Brewer told Gelestino that because he was not a major trafficker the Government would allow him to plead guilty to one felony count if he would cooperate. Throughout the evening, Gelestino appeared concerned about the fate of Dimond. As the police were taking Dimond from the apartment to transport her to the station, Officer Williams intimated that Dimond might be subject to sexual abuse if sent to the women's detention facility. Shortly thereafter, Gelestino agreed to cooperate. He identified Appellant Davis, a lawyer, as his source for drugs and agreed to participate in a controlled payment of money to Davis. He also stated that when he had been in Davis's house the previous evening he had observed a large amount of white powder, presumably cocaine, on the kitchen table. Gelestino showed police various items in his apartment but refused to let them seize anything until they obtained a warrant. Later, Magistrate Jean F. Dwyer issued a warrant, and the police then conducted a formal search of the apartment.[2]

Sergeant Gonzales dialed a telephone number that the police believed was Davis's. Gelestino told the person who answered that he was "bringing over the money." Affidavit for Davis Search Warrant, *reprinted in* Brief for Appellee at 56, 59. Accompanied by Gonzales and funded with $450 in police money, Gelestino went to Davis's house at 5900 Moreland Street, N.W. He entered and a short time later emerged without the money. He said that he had used the money to pay for cocaine that he had purchased the night before and that Davis indicated he could get more.

Detective Steven S. Finkelberg approached Magistrate Dwyer for a warrant to search Davis's house. In his affidavit, Finkelberg described the undercover work that had led to the arrest of Gelestino, Gelestino's statements that Davis was his source and that he had observed more white powder in Davis's house the day before, and the circumstances surrounding Gelestino's paying Davis $450 that evening. Magistrate Dwyer issued the warrant.

Police arrived at the Davis residence at approximately 2:20 a.m. on March 23. They observed lights on in the house. They announced their presence and, after waiting briefly without being admitted,[3] gained entry with a battering ram. Sergeant Gonzales and Detective Finkelberg entered and found Davis and another man, Bert Hoff, in the kitchen near the front door. Finkelberg identified himself and the others as police officers and advised Davis of his *Miranda* rights.[4] Quickly fanning through the house, the police found two other persons. The officers placed all four in the same room and advised them of their rights again.

1. Gelestino had participated in at least three sales to Michael Dubard, who was obtaining the cocaine for an undercover police detective. The grand jury ultimately indicted Gelestino for these sales.

2. To avoid confusion, at times we shall refer to the search of Gelestino's apartment as the "Gelestino search" and the search of Davis's house, described shortly, as the "Davis search."

3. How loudly the police knocked and announced their presence and how long they waited before entering are the subject of dispute. *See* 199 U.S.App.D.C. at ——, 617 F.2d at 695.

4. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In the meantime, the police still were surveying the premises and reporting what they were finding. One officer stated that he had discovered several pinball machines in the basement, and the police indicated, in Davis's presence, that searching them would be difficult and time consuming.[5] Shortly thereafter, Davis agreed to show the officers where the cocaine was hidden. He also led them to supplies of peyote and marijuana.[6] During this time, Officer Gonzales had reminded Davis of his rights on several occasions.[7]

Gelestino was brought before Magistrate Dwyer on the morning of March 23. The magistrate appointed an attorney to represent him and released him on personal bond. On April 13, Gelestino and his attorney appeared in the office of Assistant United States Attorney Joseph F. McSorley, at which time Gelestino and the Government entered into a formal plea agreement. Gelestino promised to testify before the grand jury and at any trial concerning his activities and any knowledge that he had of the drug traffic. In return, the Government was to permit Gelestino to plead guilty to a single charge of distributing cocaine, a violation of 21 U.S.C. § 841(a) (1976). Gelestino appeared before the grand jury on April 20, and during his testimony he admitted to trafficking in cocaine.

Gelestino was scheduled to enter his plea of guilty on May 5. Minutes before his appearance, however, he withdrew from the plea agreement. Later, the grand jury indicted him on six counts relating to possession and sale of cocaine and possession of implements of a crime. Gelestino moved to suppress the tangible evidence obtained in the search of his apartment and the statements he made both following his arrest and during his appearance before the grand jury. After three days of hearings, Judge William B. Jones of the United States District Court[8] on September 1 ruled that the warrantless entry into Gelestino's apartment and his warrantless arrest had been illegal and thus the tangible evidence seized there was inadmissible. Judge Jones also suppressed all statements made by Gelestino from the time of his arrest until Magistrate Dwyer appointed an attorney to represent him.[9] Nevertheless, Judge Jones found that Gelestino's statements to McSorley at the time he entered into the plea agreement and his testimony before the grand jury were voluntary and denied the motion to suppress them. Following a trial on stipulated facts, Judge Jones found Gelestino guilty of conspiracy to distribute cocaine, a violation of 21 U.S.C. § 846 (1976), and three counts of unlawful distribution of cocaine, violations of 21 U.S.C. § 841(a). The court sentenced him on each charge to three years' imprisonment with a special parole term of three years, the sentences to run concurrently.

Meanwhile, the grand jury had indicted Davis on eight counts of drug violations. Davis moved to suppress the tangible evidence seized in the search of his house and the statements he made during the search. He objected to the search and the seizure on several grounds: (1) that they were fruits of the unlawful police conduct at Gelestino's apartment; (2) that the affidavit supporting the search warrant was insufficient to justify a finding of probable cause; (3) that the warrant was overbroad; (4) that the warrant was executed in violation of 18 U.S.C. § 3109 (1976);[10] and (5) that a night-

---

**5.** Testimony conflicted on the question of whether the police threatened to destroy the machines if Davis failed to cooperate or simply indicated that a thorough search would be long and tedious. *See* p. —— of 199 U.S.App.D.C., p. 696 of 617 F.2d *infra*.

**6.** Davis's statements also included references to the quality of the cocaine. *See* Transcript of Proceedings on Davis's Motion to Suppress, July 7, 1978, at 53 [hereinafter cited as Davis Tr.].

**7.** *See* note 40 *infra*.

**8.** We note with sadness that Judge Jones died July 31, 1979.

**9.** The Government does not appeal Judge Jones's rulings on these motions.

**10.** For text of this section, see note 35 *infra*.

time search was not justified. He also asserted that the officers' conduct during the search coerced him into making self-incriminating statements against his will. After a hearing on July 7, 1978, District Judge Louis F. Oberdorfer denied the motions to suppress.[11] The case subsequently was transferred to Judge Jones, before whom Davis unsuccessfully attempted to reopen the suppression questions. Following a stipulated trial, the court convicted him of one count of possession with intent to distribute a controlled substance (cocaine), a violation of 21 U.S.C. § 841(a), and one count of unlawful possession of a narcotic drug (marijuana), a violation of D.C. Code § 33–402(a) (1973). Judge Jones sentenced Davis to concurrent terms of seven years imprisonment with a special parole term of four years on the cocaine charge and one year on the marijuana charge.

## II. GELESTINO'S CLAIMS

Appellant Gelestino now challenges Judge Jones's failure to suppress the statements he made before the grand jury on April 20, 1978.[12] Gelestino raises three objections to the introduction of the grand jury testimony: (1) he made the statements in connection with a plea agreement and thus Federal Rule of Criminal Procedure 11(e)(6) precludes their admission; (2) the statements were involuntary; and (3) they were fruits of the Government's illegal conduct at the time of his arrest and the search of his apartment. We reject each argument.

11. Judge Oberdorfer filed a written Memorandum and Order on August 11, 1978.

12. Gelestino also challenges the court's refusal to suppress statements he made to Assistant United States Attorney McSorley on April 13, the day of the plea-bargaining session. As Gelestino admits, however, the prosecution never introduced the content of these statements at his trial. Brief for Appellant Gelestino at 3 n.1. The question of whether the April 13 statements would have been admissible is thus an academic one we need not decide.

13. The language of this rule is virtually identical to that of Fed.R.Evid. 410. The rationales behind each are the same. *Cf.* note 15 *infra* (amendments conforming the two rules).

### A. Rule 11(e)(6)

Gelestino contends that he testified before the grand jury "in connection with" the plea agreement and that any statements thus made must be excluded under Federal Rule of Criminal Procedure 11(e)(6). This rule provides, in relevant part, that

evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of *statements made in connection with, and relevant to*, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer.

Fed.R.Crim.P. 11(e)(6) (emphasis added).[13] The Government argues that Gelestino's interpretation of the rule is overly broad and conflicts with the purposes of the rule.

Our starting point is the language of the rule itself. We agree with Gelestino that one can read expansively the words "statements made in connection with, and relevant to" a plea entered or offered. This language, however, is hardly free from ambiguity, and there is no clear literal meaning that we are bound to give effect. *See Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). Indeed, the rule has been subject to a variety of interpretations,[14] amendments, and proposed amendments,[15] which suggests that

14. *Compare, e. g., United States v. Robertson*, 582 F.2d 1356 (5th Cir. 1978) (en banc), *and United States v. Stirling*, 571 F.2d 708 (2d Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978), *discussed at* pp. —— —— of 199 U.S.App.D.C., at pp. 684–685 of 617 F.2d *infra, with, e. g., United States v. Herman*, 544 F.2d 791 (5th Cir. 1977). *See generally* note 17 *infra*.

15. As first adopted, Federal Rule of Evidence 410 rendered inadmissible "statements made in connection with" pleas or offers. *See* Act of Jan. 2, 1975, Pub.L.No. 93–595, § 1, 88 Stat. 1926 (amended 1975). In 1975, Congress added the "and relevant to" language to rule 11(e)(6). *See* Act of July 31, 1975, Pub.L.No. 94–64, § 3(10), 89 Stat. 370 (codified at Fed.R.

its meaning is less than crystal clear. In our analysis, then, we must consider the rule's underlying policies as well as its words, for "intention prevails over the letter, and the letter must if possible be read so as to conform to the spirit . . . ." 2A Sutherland Statutory Construction § 46.07, at 65 (4th ed. C. Sands 1973).

Plea bargaining and negotiated pleas, although still unseemly in the minds of some, confer substantial benefits on the criminal justice system. As the Supreme Court has observed, "Whatever might be the situation in an ideal world, the fact is that the guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned." *Blackledge v. Allison,* 431 U.S. 63, 71, 97 S.Ct. 1621, 1627, 52 L.Ed.2d 136 (1977).[16] Rule 11(e)(6) seeks to promote negotiated dispositions of criminal cases by giving the defendant protection from involuntary self-incrimination at two ends of the plea-bargaining spectrum: while he is negotiating over the disposition of his case and while he is offering or entering a plea that is rejected or later withdrawn.

Rule 11(e)(6) focuses primarily on the negotiation stage. It derives from "the inescapable truth that for plea bargaining to work effectively and fairly, a defendant must be free to negotiate without fear that his statements will later be used against him." *United States v. Herman,* 544 F.2d 791, 796 (5th Cir. 1977). *See United States v. Smith,* 525 F.2d 1017, 1020–21 (10th Cir. 1975); *United States v. Ross,* 493 F.2d 771, 775 (5th Cir. 1974). The most significant factor in the rule's adoption was the need for free and open discussion between the prosecution and the defense during attempts to reach a compromise. Subdivision (e)(6) fosters this kind of frank exchange. *See* Comm. on Rules of Practice and Procedure, Judicial Conf. of the U.S., Preliminary Draft of Proposed Amendments, 77 F.R.D. 507, 534 (1978). Congress, when it considered this provision, suggested that absent such a shield the possibility of self-incrimination would "discourage defendants from being completely candid and open during plea negotiations . . . ." H.R.Rep. No.94–247, 94th Cong., 1st Sess. 7 (1975) U.S.Code Cong. & Admin.News 1975, at pp. 674, 679.[17]

Crim.P. 11(e)(6)). It then amended rule 410 to conform. *See* Act of Dec. 12, 1975, Pub.L.No. 94–149, 89 Stat. 805 (codified at Fed.R.Evid. 410).

Recently, the advisory committee appointed to study these rules and others suggested that rule 11(e)(6) be amended to exclude "statements made in the course of or as a consequence of such pleas or plea discussions . . . ." Comm. on Rules of Practice and Procedure, Judicial Conf. of the U.S., Preliminary Draft of Proposed Amendments, 77 F.R.D. 507, 531 (1978). This proposal, however, was not presented to Congress. Instead, on April 30, 1979, Chief Justice Burger transmitted a proposed amendment to rule 11(e)(6) that, if enacted, would require the exclusion of "any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn . . . ." H.R. Doc.No. 96–112, 96th Cong., 1st Sess. 79 (1979). Congress has deferred action on these proposals, delaying their effective date until December 1, 1980, or when it expressly approves them, whichever occurs first. Act of July 31, 1979, Pub.L.No. 96–42, 93 Stat. 326.

16. *Accord, Bordenkircher v. Hayes,* 434 U.S. 357, 361–62, 98 S.Ct. 663, 54 L.Ed.2d 604

(1978); *Santobello v. New York,* 404 U.S. 257, 260, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971) (disposition of criminal charges by plea bargaining is "an essential component of the administration of justice" and "is to be encouraged"); *Brady v. United States,* 397 U.S. 742, 751–52, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). *See generally* ABA Standards Relating to the Administration of Criminal Justice, Pleas of Guilty (approved draft 1968); ALI Model Code of Prearraignment Procedure § 350.3 (1975).

17. The "negotiation" end of the spectrum generally deals with statements made during discussions with the prosecution designed to reach a plea agreement. Whether the rule also extends to statements made during extremely early stages, such as police investigation or interrogation, currently is a matter of dispute. *Compare* H.R.Doc.No.96–112, *supra* note 15, at 84 (cases involving statements made to law enforcement agents "are not covered by the per se rule of 11(e)(6) and thus must be resolved by that body of law dealing with police interrogations") *with United States v. Herman,* 544 F.2d 791, 798 (5th Cir. 1977) (defendant's statements to postal inspectors who had no authority to negotiate a plea held inadmissible under rule 11(e)(6) because they were made "during the

At the opposite end of the spectrum, statements made in conjunction with a plea of guilty that is made in open court but rejected or later withdrawn also are inadmissible. For example, the rule precludes the admission of the defendant's responses to questions concerning the voluntariness of the plea posed by the trial judge pursuant to Federal Rule of Criminal Procedure 11(d). *See* 121 Cong.Rec. 17,492 (1975) (remarks of Rep. Wiggins). Other statements made "during proceedings in connection with the disclosure and acceptance or rejection of a plea agreement" fall within the rule as well. H.R.Rep.No.94–247, *supra* at 7 n.9, U.S.Code Cong. & Admin.News 1975, at 680.[18] Excluding these statements is necessary to effectuate the rejection or later withdrawal. Were the statements admissible, the defendant's own incriminating words, inseparably linked to a plea now regarded as a nullity, in many cases would operate to convict him, thereby rendering meaningless the rejection or withdrawal.

The grand jury testimony in this case falls between these two points on the plea-bargaining spectrum. In particular, the issue here is whether rule 11(e)(6) applies to grand jury testimony given after formalization of a plea agreement but before the defendant has entered his plea, the defendant withdrawing from that agreement and pleading not guilty instead. The Government asks us to follow the decision of the Court of Appeals for the Second Circuit in *United States v. Stirling,* 571 F.2d 708 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978), and hold that the rule does not apply in these circumstances. Gelestino counters that *Stirling* is distinguishable and that, in any event, it was decided incorrectly.

In *Stirling,* one defendant had entered into a formal, written plea agreement in which he promised to appear before a grand jury. After testifying before the grand jury, this defendant withdrew from the agreement, pleaded not guilty, and faced trial. The trial judge, over the defendant's objection, permitted the Government to introduce his grand jury testimony. On appeal, he raised the same argument that Gelestino raises here; namely, that rule 11(e)(6) forbids the use of such testimony because it was made "in connection with" the plea agreement.

The *Stirling* court rejected the defendant's argument and found that the grand jury testimony was not a statement "made in connection with" a plea agreement within the meaning of the rule. Underlying the rule, said the court, is a policy that " 'a defendant must be free to negotiate without fear that his statements will later be used against him.' " *Id.* at 731 (quoting *United States v. Herman,* 544 F.2d 791, 796 (5th Cir. 1977)). The court noted that the drafters were concerned primarily with " 'fairly formal plea bargaining between the United States Attorney and counsel for the defendant after charges had been, or were about to be, made.' " *Id.* (quoting 2 Weinstein's Evidence ¶ 410[07], at 410–40 (1977)) (emphasis deleted). At the time the defendant in *Stirling* testified, however, he had completed negotiations with the prosecutor and had agreed to appear before the grand jury and to plead guilty. His failure to make the agreed plea, according to the court, justified use of the testimony against him. *Id.* at 731–32. The court concluded that the defendant

course of a conversation in which [the defendant] sought concessions from the government in return for a guilty plea").

**18.** One court has taken the view that a defendant's letter that presented information and contentions concerning his guilt and his motivation in pleading guilty and that was sent to the court after it had accepted and entered his guilty plea was a statement "made in connection with, and relevant to" his plea. *See United States v. Albano,* 414 F.Supp. 67, 69 n.1 (S.D.N.Y.1976). Based on the content of the

letter and close questioning of the defendant, the court directed that his plea be withdrawn as lacking a sufficient factual basis. The prosecution then moved for production of the letter prior to trial. In denying this motion and determining that the letter could not be used against the defendant, the court noted that the letter's potentially incriminating statements were made "shortly after a plea of guilty, incidental to the plea of guilty, and in contemplation of sentence to be imposed as a result of the plea of guilty . . . ." *Id.* at 69.

voluntarily negotiated his plea agreement, voluntarily appeared before the Grand Jury, and voluntarily decided to violate his plea agreement. He could have relied on the agreement to protect himself. . . . His breach of the agreement removed that protection. Such a result can hardly be said to undercut the confidence and candor needed for successful and fair plea negotiations. It simply means that once the agreement is finalized its terms will be enforced.

*Id.* at 732 (citations omitted).

Gelestino would distinguish *Stirling* in that the *Stirling* plea agreement expressly provided for the use of the defendant's testimony in case of breach, whereas Gelestino's did not, and that *Stirling* involved fair and formal negotiating procedures not present in the case now before us. We agree that this case is not identical to *Stirling.* The differences, however, do not go to the heart of our inquiry under rule 11(e)(6); namely, whether grand jury testimony after a plea agreement is made "in connection with" a guilty plea or offer and thus inadmissible per se.[19]

Because we do not believe that *Stirling* is distinguishable, we must decide whether to adopt the Second Circuit's substantive holding as the law of this circuit. The legislative history and the wording of subdivision (e)(6), as noted above,[20] indicate that its main purpose is to promote the free and open negotiation that must precede any compromise between the defense and the prosecution. Gelestino's appearance before the grand jury, however, followed all negotiations. Excluding testimony made after—and pursuant to—the agreement would not serve the purpose of encouraging compromise. Indeed, such a rule would permit a defendant to breach his bargain with impunity: he could renounce the agreement and return to the status quo ante whenever he chose, even though the Government has no parallel power to rescind the compromise unilaterally. *See Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).[21] The drafters of rule 11(e)(6) could not have contemplated such a result.

Likewise, exclusion in the case before us does not serve the rule's goal of making the withdrawal of a guilty plea effective. A defendant has no absolute right to withdraw a plea of guilty; permission to withdraw rests in the sound discretion of the trial court. *See, e. g., United States v. Roberts,* 187 U.S.App.D.C. 90, 99, 570 F.2d 999, 1008 (D.C. Cir. 1977); *Everett v. United States,* 119 U.S.App.D.C. 60, 64, 336 F.2d 979, 983 (D.C. Cir. 1964).[22] Rule 11(e)(6) applies to statements made in connection with those pleas that a court, in the exercise of its discretion, rejects immediately or later allows the defendant to renounce. In each case, the court has good reasons for not allowing the plea to stand—reasons other than the defendant's reevaluation of his chances of success and regret at his earlier decision to plead guilty. *See Brady v. United States,* 397 U.S. 742, 757,

---

**19.** The fairness and the formality of the negotiations, as well as the content of the final agreement, are more appropriately considered when we ask whether Gelestino voluntarily entered into the plea agreement and whether the statements should have been excluded as fruits of the illegal conduct surrounding Gelestino's arrest. *See* pp. ——-—— of 199 U.S.App.D.C., pp. 686–689 of 617 F.2d *infra.*

**20.** *See* pp. ——-—— of 199 U.S.App.D.C., pp. 682–684 of 617 F.2d *supra.*

**21.** In *United States v. Owen,* 492 F.2d 1100 (5th Cir.), *cert. denied,* 419 U.S. 965, 1019, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974), the Court of Appeals for the Fifth Circuit applied a contract analysis in evaluating and rejecting a defendant's contention that he had a right to rescind a plea agreement and to suppress any evidence secured by the Government as a result of his cooperation under the bargain. The court stated that even if the Government had committed an "anticipatory repudiation" of the agreement, the defendant was not injured because the Government remained ready, willing, and able to perform its end of the bargain. *Id.* at 1108–09.

**22.** *Cf.* 2 Weinstein's Evidence ¶ 410[02], at 410–21 (1977) (permission to withdraw should be granted liberally unless the defendant has no potential defense and the plea and its withdrawal are part of a scheme to buy time or to prejudice the Government).

90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Refusing to admit statements made in conjunction with a plea rejected or withdrawn, by returning the defendant to where he would have been had he not offered or entered the plea, effectuates the court's decision that rejection or withdrawal is proper. By contrast, excluding grand jury testimony simply because the defendant later "wants out" of his plea agreement presents a far different situation.

■ Because exclusion here would not serve the purposes for which rule 11(e)(6) was adopted, we hold that the rule does not apply in the situation now before us. We are not saying that grand jury testimony is admissible in every case in which a defendant renounces his plea bargain, regardless of the circumstances that led him to enter into or to break the agreement. If we were convinced, for example, that a defendant had agreed to a plea only because of coercion, we might be convinced as well that statements made pursuant to the "bargain" were involuntary and thus inadmissible. Voluntariness, however, is a concern separate from the scope of rule 11(e)(6), a per se rule that, if applicable, commands the court to exclude statements without exception. We shall address the question of voluntariness in the present case shortly. For now, we conclude only that for purposes of rule 11(e)(6) statements made by a defendant in testimony before a grand jury pursuant to a plea agreement are not "statements made in connection with, and relevant to" plea negotiations, offers of pleas, or pleas entered and later withdrawn.[23]

### B. Voluntariness

■ Gelestino also argues that the trial court should have suppressed his grand jury testimony because it was involuntary. He contends that his testimony resulted from prosecutorial promises of leniency under the plea bargain and from a series of other governmental inducements. He submits that his statements, being so induced, must be excluded as involuntary under *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).[24]

If accepted, Gelestino's argument in effect would create a rule that testimony or information given pursuant to a plea bargain is involuntary per se, for a defendant's execution of his part of a bargain is always "induced" by the prosecution's return promises. Such a rule would be overbroad and unwarranted. In *Hutto v. Ross,* 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976), the Supreme Court stated that "the Court of Appeals erred when it held that *any* statement made as a result of a plea bargain is inadmissible." *Id.* at 30, 97 S.Ct. at 203 (emphasis by the Court). The logic of Gelestino's approach not only would create a rule of per se involuntariness for statements made pursuant to a bargain but also would render involuntary the pleas themselves, which also derive from the Government's promises. We cannot conclude that pleas and statements resulting from plea bargaining are *always* involuntary. Rather, the proper task is a case-by-case consideration of whether the defendant voluntarily entered into the plea agreement and

---

**23.** *Accord,* S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 83–84 (2d ed. Supp. 1979) (approving of *Stirling*).

**24.** Gelestino relies heavily on our decision in *United States v. Powe,* 192 U.S.App.D.C. 224, 591 F.2d 833 (D.C. Cir. 1978), in which we observed that "self-incriminating statements induced by promises or offers of leniency shall be regarded as involuntary and shall not be admitted into evidence for any purpose." *Id.* at 227, 591 F.2d at 836 (footnote omitted). Despite its broad language, we do not believe that *Powe* governs our decision here. In *Powe* we held only that the circumstances surrounding the defendant's making of incriminating state-

ments should have alerted the trial judge that a genuine question of voluntariness existed. We did not hold that the statements, made a short time after the defendant had indicated that she was refusing to speak, in fact were involuntary. *Cf. Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (interrogation must cease if the person in custody indicates that he wishes to remain silent). Instead, we remanded the case for a hearing to determine if the defendant spoke voluntarily. In the case before us, Gelestino has had his hearing, and the question we face is whether the trial court's decision that his statements were indeed voluntary should stand.

whether he testified voluntarily, as revealed by an examination of the surrounding circumstances. *See Haynes v. Washington,* 373 U.S. 503, 513–14, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). *See generally Brady v. United States,* 397 U.S. at 753–55, 90 S.Ct. 1463. We now must undertake that task in the case before us.

In determining the voluntariness of Gelestino's grand jury testimony, we must consider numerous circumstances. Gelestino admitted that he voluntarily came to the United States Attorney's office. *See* Transcript of Proceedings on Gelestino's Motion to Suppress, Aug. 31, 1978, vol. 2, at 147, 160 (testimony of Gelestino) [hereinafter cited as Gelestino Tr. I]. He freely negotiated the plea agreement while represented by counsel.[25] He appeared and testified before the grand jury without compulsion. *Id.* at 155–58, 160.[26] He then decided to renounce the plea agreement and, instead, to plead not guilty. *Id.* at 159–60.

■ By freely entering into a plea agreement, Gelestino sought a disposition of the charges against him more advantageous than he thought he would obtain at trial. The Government's promises of leniency and dismissal were bargained-for terms of the agreement, not overbearing or improper inducements.[27] His testimony was a quid pro quo for the Government's promises, promises of the sort that are permissible—indeed, encouraged—in the plea-bargaining process. We cannot say that the Government's promises were such that they rendered Gelestino's statements involuntary. Rather, we conclude that he testified voluntarily.

### C. "Fruit of the Poisonous Tree"

Lastly, Gelestino argues that his grand jury testimony was the fruit of illegal police and prosecutorial conduct and thus should be suppressed under *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He asserts that his testimony was tainted by a chain of events that began with his illegal arrest on March 22, 1978. Judge Jones suppressed the incriminating statements made from the time of his arrest until he was presented to the magistrate on the morning of March 23. Gelestino claims that the purpose of the police conduct during this period—conduct that included denial of counsel, representations that he must cooperate now or never, threats to his property, preliminary plea negotiations with the Assistant United States Attorney while not yet represented by counsel, and the one officer's lurid allusions to his girlfriend's safety—was to coerce him to cooperate. On the night of his arrest, Gelestino named his source, arranged for a buy from this source,

**25.** "*Bram* and its progeny did not hold that the possibly coercive impact of a promise of leniency could not be dissipated by the presence and advice of counsel . . . ." *Brady v. United States,* 397 U.S. at 754, 90 S.Ct. at 1472.

**26.** Gelestino, at the time he testified, was advised again of his rights, including his right to remain silent, and he has admitted that he understood them. *See* Transcript of Proceedings on Gelestino's Motion to Suppress, Aug. 31, 1978, vol. 2, at 155–57 (testimony of Gelestino).

**27.** Gelestino contends that his testimony was prompted by fear for the safety of his girlfriend, Sali Dimond, and the Government's intimation that her freedom hinged on his cooperation. The written agreement embodying the plea bargain, however, contains no promises of leniency for Dimond. In fact, the agreement expressly provides that the "United States makes no promises or representations with respect to what prosecutive action it may take against possible co-defendants and/or coconspirators." Memorandum of Agreement Between Gelestino and the United States ¶ 5, *reprinted in* Brief for Appellee at 86, 88. The parties acknowledged that the written memorandum embodied their entire agreement. *Id.* at ¶ 10, *reprinted in* Brief for Appellee at 90.

In any event, we doubt that Gelestino's contention, even if borne out by the facts, would justify a finding of involuntariness. In *United States v. Mullens,* 536 F.2d 997 (2d Cir. 1976), the court rejected the defendant's argument that his confession and cooperation were compelled by a desire to protect his parents, whom the police were detaining. The court in *Mullens* remarked that "no federal court has yet held that a confession or consent is involuntary solely on the ground that it was prompted by the defendant's desire to protect a relative from the rigors of arrest, interrogation and possible confinement." *Id.* at 1000.

and made incriminating statements. *See* Gelestino Tr. I, *supra* at 110–13 (testimony of Gelestino). He now argues that the plea agreement of April 13 was nothing more than the written memorial of his earlier commitment to cooperate, which the police had obtained under coercion on March 22. The April 20 grand jury testimony, which he promised to give under the plea agreement, thus becomes, in Gelestino's view, a direct fruit of the illegal governmental conduct that already had occurred.

The exclusionary rule for unlawfully seized evidence, *see Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), does not apply if the causal connection between the information obtained illegally and the proof offered by the prosecution has "become so attenuated as to dissipate the taint." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). The characterization of evidence as "fruit of the poisonous tree," which renders it inadmissible, depends on " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States,* 371 U.S. at 488, 83 S.Ct. at 417 (quoting J. Maguire, Evidence of Guilt § 5.07, at 221 (1959)). In the case of statements, *Wong Sun* requires that they be "sufficiently an act of free will to purge the primary taint." *Id.* at 486, 83 S.Ct. at 416–417. Courts must make this determination on the facts of each case after considering such matters as "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances," and the purpose and the flagrancy of the official misconduct. *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–2262, 45 L.Ed.2d 416 (1975).

In the case before us, Gelestino testified before the grand jury several weeks after his arrest, when he was free on personal bond. He was represented by counsel, with whom "he was regularly in contact." Transcript of Proceedings on Gelestino's Motion to Suppress, Sept. 1, 1978, at 87 (findings of fact by Jones, J.). He had been advised of his rights and conceded that he understood them. Gelestino Tr. I, *supra* at 155–57 (testimony of Gelestino). The official misconduct did not extend beyond March 23, and the unlawful acts at that time were intended only to evoke his immediate cooperation. No wrongdoing occurred in connection with his actual entry into the written plea agreement on April 13, some three weeks after his arrest and one week before he testified. We see no sign of coercion or other governmental misconduct that would have compelled Gelestino to incriminate himself before the grand jury against his will.

Gelestino nevertheless argues that as a result of the coercion on March 22–23 and the statements he made in response, "he had already committed himself, albeit unwillingly, to cooperate with the government and testify before the Grand Jury." Brief for Appellant Gelestino at 38. He claims that he "felt that he had no choice but to continue cooperating by testifying before the Grand Jury. From his perspective, at least, his goose was cooked on the night of his arrest, the cat was out of the bag." *Id.* at 40. In *Bayer v. United States,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), the Supreme Court rejected an argument very similar to the one Gelestino now presents. The Court reversed a decision by the Court of Appeals for the Second Circuit, which had held that a second confession was the fruit of an earlier, coerced one. The Court reasoned:

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from mak-

ing a usable one after those conditions have been removed.

*Id.* at 540–41, 67 S.Ct. at 1398.

The exclusionary rule has served its deterrent purpose in the present case by disallowing the use of statements Gelestino made at the time government officials illegally arrested and questioned him. To apply the exclusionary rule to his grand jury testimony, rendered freely and voluntarily after time to consult with counsel and to reflect on his decision to cooperate, would serve no legitimate goal. The taint of the Government's illegality had dissipated by the time Gelestino took the witness stand. Judge Jones properly admitted his grand jury testimony at trial.

### III. DAVIS'S CLAIMS

Appellant Davis's several challenges to his conviction fall into two categories, those based upon the introduction at trial of tangible evidence obtained in the March 23, 1978, search of his house and a separate one asserting that the statements he made during that search were not voluntary and thus should be suppressed. We reject Davis's arguments and find the admission of both the tangible evidence and the statements to have been proper.

#### A. Tangible Evidence

Davis argues on four grounds that the trial court should have suppressed the evidence obtained in the search of his house: (1) the magistrate could not properly use evidence and statements obtained illegally from Appellant Gelestino to find probable cause for a warrant to search Davis's house; thus the evidence obtained in the Davis search was "fruit of the poisonous tree"; (2) the warrant, in any event, was not supported by probable cause; (3) the police executed the warrant in violation of 18 U.S.C. § 3109 (1976); and (4) the totality of the circumstances surrounding the case represents police misconduct so egregious that due process should preclude conviction.[28] We address these claims in order.

#### 1. "Fruit of the Poisonous Tree"

Before trial, Davis moved to suppress all tangible evidence found in his house on the ground that the police obtained it as a consequence of the illegal search of Gelestino's apartment. Judge Oberdorfer denied the motion, ruling that Davis lacked standing to challenge the Gelestino search. Davis now renews this challenge and asks us to rule that the interest he alleges he had in the cocaine as "consignor" gives him standing to raise the unconstitutionality of the Gelestino search. If he has standing, he asserts, the illegality of the Gelestino search rendered improper the use at his own trial of evidence obtained in the Davis search because the latter was "fruit of the poisonous tree" under *Wong Sun. See generally Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

Courts have struggled to define the proper scope of the exclusionary rule announced in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), which bars the use of evidence obtained in violation of the fourth amendment. The rule clearly does not ban the introduction of all illegally obtained evidence against all persons for all purposes; rather, it vindicates only the rights of the person whose privacy the government unlawfully has invaded. *E. g., United States v. Ceccolini,* 435 U.S. 268, 275, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Stone v. Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). As the Supreme Court has stated, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 966–967, 22 L.Ed.2d 176 (1969).

In determining whether a defendant may benefit from the exclusionary rule, courts often have framed the issue as one of "standing" to raise the fourth amendment claim. Recently, however, the Supreme

---

**28.** Davis raised other claims before the trial court as well. *See* pp ———— of 199 U.S.
App.D.C., pp. 681–682 of 617 F.2d *supra.* He does not renew these claims now.

Court has instructed us to consider this question not under the rubric of "standing" but as a substantive element of the challenging party's fourth amendment claim. *See Rakas v. Illinois*, 439 U.S. 128, 132–40, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Under the *Rakas* approach, we must ask whether the party seeking exclusion had a "legitimate expectation of privacy" that the government infringed. *Id.* at 143, 99 S.Ct. 421.

■ In the case before us, we are satisfied that, in unlawfully entering and searching Gelestino's apartment, government agents invaded no legitimate expectation of privacy held by Davis. Davis asserts no interest in Gelestino's apartment, the place searched. He rests his argument solely on the interest he claims as "consignor" of the cocaine found there. The simple fact that Davis and Gelestino characterized their transaction as a "consignment," however, does not by itself give rise to a legitimate expectation of privacy in Davis. This court has noted previously that "it is not necessary to import the subtle refinements of property law into the law surrounding search and seizure." *Parman v. United States*, 130 U.S.App.D.C. 188, 194, 399 F.2d 559, 565 (D.C.Cir.) (Burger, J.), *cert. denied*, 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126 (1968). *Accord, Rakas v. Illinois*, 439 U.S. at 143, 99 S.Ct. 421. At most, Davis's status as "consignor" proves only that he retained *some* property interest, but a property interest alone does not guarantee that the party asserting it will prevail on the merits of his fourth amendment claim. *United States v. Shelby*, 573 F.2d 971, 973 (7th Cir. 1978); *United States v. Alewelt*,

532 F.2d 1165, 1168 (7th Cir.), *cert. denied*, 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976). *See Alderman v. United States*, 394 U.S. at 189 n.2, 89 S.Ct. 961 (Harlan, J., concurring in part and dissenting in part). Indeed, by giving Gelestino actual possession and control of the cocaine, Davis voluntarily surrendered any expectation of privacy relating to the drug. Although in a literal sense he did not "expect" publication of his interest in the cocaine, possession of which is a crime,[29] he not only expected but also intended for Gelestino, his "salesman," to show it to potential buyers and, upon payment, to relinquish it to them. Davis offered no evidence that he retained any control over access to the cocaine. Having no dominion over who would use it, buy it, or even see it, Davis cannot argue that he continued to have an expectation of privacy in the cocaine seized from Gelestino's apartment. *See United States v. Archbold-Newball*, 554 F.2d 665, 677–78 (5th Cir. 1977); *United States v. Hunt*, 505 F.2d 931, 940–41 (5th Cir. 1974), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975).[30]

Davis argues that *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), controls our decision. In *Jeffers*, police, after unlawfully entering and searching Jeffers' aunts' hotel room, found and seized cocaine that Jeffers had stored there. The Government contended that the officers' entry, though illegal as to the aunts, was legal as to Jeffers, who neither was present in the hotel room at the time of the search nor was a lessee of the premises. The Government claimed that Jeffers only had standing to attack the seizure, and not the search, and that the seizure of admitted

---

**29.** As the Supreme Court recently stated,

> Obviously, however, a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified expectation of privacy, but it is not one which the law recognizes as "legitimate."

*Rakas v. Illinois*, 439 U.S. at 143 n.12, 99 S.Ct. at 430 n.12.

**30.** Had Davis himself retained actual possession of the cocaine found in Gelestino's apart-

ment or had he otherwise controlled access to it, we might have reached a different conclusion. Simply displaying goods for sale, for example, does not effect an abandonment of one's privacy interest in them, for a government search differs greatly from a customer's inspection of merchandise offered for sale. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979). Davis, however, exercised no control over who had access to the cocaine he left in Gelestino's possession.

contraband was lawful. The Supreme Court rejected this argument. It refused to separate the search from the seizure and held that the single event was illegal and thus required the exclusion of the cocaine at trial.

Two factors lead us to conclude that *Jeffers* does not apply to the case before us. First, Jeffers had direct access to the premises searched. He, and not his aunts, retained control over the cocaine. Here, on the other hand, Davis had relinquished all control to Gelestino. Second, though language in *Jeffers* might suggest that Jeffers' being the "target" of the search gave him "standing," the Court in *Rakas v. Illinois* expressly rejected the "target" theory of "standing" and explained that the decision in *Jeffers* rested "on Jeffers' possessory interest in both the premises searched and the property seized." 439 U.S. at 136, 99 S.Ct. at 426. Unlike Jeffers, Davis has claimed no interest in the premises searched, and his interest in the cocaine was not one that suggested a continuing expectation of privacy.

Davis has argued alternatively that he has "automatic standing" to challenge the Gelestino search. Although traditional notions of "standing" now have given way to an analysis of the claimant's privacy expectations, "automatic standing" is a different theory: it expressly permits one person to stand in the shoes of another and argue violations of the other's fourth amendment rights. *Rakas v. Illinois*, 439 U.S. at 135 n.4, 99 S.Ct. 421. Under this rule, any person charged with a crime having possession of goods as an element of the offense may raise the unconstitutionality of a search or a seizure that yielded the goods allegedly possessed. *Jones v. United States*, 362 U.S. 257, 263–65, 80 S.Ct. 725, 4

L.Ed.2d 697 (1960). Automatic standing seeks to cure two vices that existed under prior law. First, it eliminates the need for a defendant to admit possession, an element of the offense, before he can argue for the suppression of evidence tending to prove that element.[31] Second, it prevents the prosecution from taking contradictory positions, charging possession as an element of the crime but denying it on the question of suppression. *See id.* at 261–65, 80 S.Ct. 725. *Accord, Brown v. United States*, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).

Davis does not present a claim falling within the traditional contours of automatic standing. As the Government correctly observes, *see* Brief for Appellee at 19 n.22, none of the cocaine seized in the Gelestino search was introduced at Davis's trial, for he was charged with possession only of the drugs found in his own house. Davis responds, however, that the police did use the cocaine seized in the Gelestino search to establish probable cause for securing the warrant to search his house. This position, Davis asserts, amounts to governmental self-contradiction of the type that automatic standing seeks to prevent. He argues that the prosecution may not allege he retained an interest as "consignor" of the cocaine taken from Gelestino's apartment to obtain a search warrant and then deny that the unlawful Gelestino search violated any of Davis's rights.

We need not decide the difficult question of whether to extend automatic standing to a situation in which the police obtain a search warrant based on the interest one has in goods illegally seized from another and the prosecution secures a conviction only by reason of the evidence seized pursuant to the warrant. On the facts be-

31. Several years after adopting the rule of automatic standing in *Jones*, the Supreme Court decided *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). *Simmons* held that the prosecution may not introduce at trial any statement made by a defendant at a hearing on a motion to suppress evidence allegedly seized in violation of the fourth amendment. *Id.* at 394. This holding effective-ly—and more directly—solves the first problem that *Jones* had sought to correct. Whether automatic standing survived *Simmons* is a question the Supreme Court has yet to resolve. *See Rakas v. Illinois*, 439 U.S. at 135 n.4, 99 S.Ct. 421. Because we find the doctrine of automatic standing inapposite here, we need not reach this issue either.

fore us, the Davis search warrant was not grounded on any continuing interest Davis may have had in the cocaine seized in the Gelestino search. Rather, probable cause to search Davis's house derived from Gelestino's statements that Davis was the source of the cocaine and that he had more, from Gelestino's delivery of marked bills to someone in Davis's house, and from Gelestino's telephone call arranging for that delivery.[32] It was his *past* possession of the cocaine found at Gelestino's apartment and the likelihood that he *currently* possessed more that led the magistrate to issue the warrant. *See Brown v. United States*, 411 U.S. at 228–29, 93 S.Ct. 1565. Davis's alleged interest in the cocaine seized in the Gelestino search, even if sufficient to permit him to challenge the seizure itself, was not used by the Government to persuade the magistrate that probable cause existed to search his house. Thus, despite Davis's contention to the contrary, there was no improper "governmental self-contradiction" in this case.

## 2. Probable Cause

Davis also contests the magistrate's finding of probable cause to search his house. He asserts, first, that the affidavit was inadequate on its face and, second, that even if the affidavit was facially sufficient, Detective Finkelberg's failure to disclose the irregularities surrounding the Gelestino search constituted a deliberate or reckless falsehood that requires suppression of any evidence obtained under the warrant. We reject both arguments.

■ We begin by noting that probable cause requires a finding only of a probability of criminal activity, not a prima facie showing thereof. *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Magistrates need not confine their evaluations within rigorous legalistic boundaries but instead may use their com-

mon sense. *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Sitting in review, we should accord their findings considerable deference. *See Jones v. United States*, 362 U.S. at 270–71, 80 S.Ct. 725.

■ After examining the affidavit presented to Magistrate Dwyer, we cannot say that she erred in finding probable cause to search Davis's house. Judge Oberdorfer, in his Memorandum and Order denying Davis's motion to suppress, listed the factors supporting probable cause:

> The affidavit here describes the circumstances leading to the arrest of Gelestino, including the purchase of a large quantity of cocaine; Gelestino's explanation of where he purchased the cocaine which the police recovered; Gelestino's statement that he observed a quantity of white powder on the kitchen table at [Davis's] home when he was there to purchase the cocaine; Gelestino's voluntary participation in a hand delivery of marked bills to [Davis's] home; and Gelestino's telephone call arranging the delivery, which was overheard by police officers, and which Gelestino alleged was to Davis.

*United States v. Davis*, Crim. No. 78–245, Memorandum and Order at 3–4 (D.D.C. Aug. 11, 1978).

■ Davis asserts that the facts just outlined were not sufficient for the magistrate to conclude that the information provided by Gelestino was reliable. Under *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), a magistrate may not issue a warrant based on information supplied by an informant unless the magistrate can make an independent judgment from the facts before him that (1) the informant is credible; *i. e.*, he is telling what he under-

---

**32.** We realize the affidavit for the warrant stated that Gelestino's practice was to "get the cocaine on consignment . . . ." Affidavit for Davis Search Warrant, *reprinted in* Brief for Appellee at 56, 59. This reference to "consignment," however, appeared only once, in passing; the focus remained on Davis's being a supplier whom Gelestino stated had more. We do not feel that this single mention of "consignment" was crucial to the magistrate's finding of probable cause to search Davis's house for more cocaine, and we are not willing to hold that absent that reference probable cause would have been lacking.

stood to have occurred, and (2) the informant obtained his information in a reliable way. The affidavit in this case clearly indicates that Gelestino acquired his information concerning Davis's traffic in cocaine from personal knowledge, an inherently reliable method of obtaining such information.[33] The only issue that remains, then, is whether Magistrate Dwyer should have believed that Gelestino was telling the truth when he related his story to the police.

One method of establishing an informant's veracity is his history of providing the police with accurate information. *See Aguilar v. Texas,* 378 U.S. at 114 n.5, 84 S.Ct. 1509. The informant's "track record," however, is not the only way. For example, if he relates information in such detail that only one with actual knowledge could provide it and police verify some portion of his story, this partial confirmation may justify the magistrate in concluding that he is worthy of belief. *See Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), *discussed in Spinelli v. United States,* 393 U.S. at 417–18, 89 S.Ct. 584.

■ In the case before us, the Government argues that the magistrate properly could conclude that Gelestino was trustworthy because the statements he made implicated not only Davis but also himself in the commission of a crime. When one makes an admission against his own penal interest, he tends to be telling the truth. As the Chief Justice has observed:

> Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search.

*United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971) (plurality opinion by Burger, C. J.). Moreover, should he lie to the police, the person admitting a crime risks disfavor with the prosecution. "[O]ne who knows the police are already in a position to charge him with a serious crime will not likely undertake to divert the police down blind alleys." 1 W. LaFave, *Search and Seizure* § 3.3, at 528 (1978). We thus are satisfied that an admission against penal interest may form the basis for a magistrate's conclusion that an informant is reliable. On the facts before us, we cannot say that Magistrate Dwyer should have rejected Gelestino's statements as coming from a source unworthy of belief.[34]

Davis further contends that even if the warrant was valid on its face, the trial court should have found that Detective Finkelberg's failure to describe in full the circumstances surrounding Gelestino's statements constituted a misstatement, material to the finding of probable cause, that was made either deliberately or with reckless disregard for the truth. If this be the case, then *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), requires suppression of all evidence obtained pursuant to the warrant. We do not agree, however, that Davis has made the "substantial preliminary showing" that *Franks* demands before the trial court is obliged to hold a hearing and look beyond the face of the affidavit. *See id.* at 155–56, 98 S.Ct. 2674.

■ Davis contends that failure to apprise the magistrate of the circumstances under which Gelestino made his statements took them out of context and made Finkelberg's description of them materially false. According to Davis, a full description of the

---

33. Davis does not allege that Gelestino suffered from any malady that would interfere with his sensory skills or memory. Davis questions only the magistrate's ability to conclude that Gelestino was telling the truth about what he actually did or did not observe.

34. We are not saying, of course, that admitted criminals in general are more trustworthy than other informants. An admission of criminal involvement suggests reliability only for statements made in connection with that admission. *See* 1 W. LaFave, *Search and Seizure* § 3.3, at 525 (1978).

illegality of the search, the insinuations that harm might come to Miss Dimond, and other coercive tactics would have led the magistrate to conclude that Gelestino's statements were not reliable. We do not believe the recitation of these facts would have tipped the balance against a finding of probable cause. All Finkelberg needed to demonstrate was a probability, not a certainty or even a prima facie case, that cocaine would be found in Davis's house. As just discussed, Gelestino, even when making statements under coercion, still would have harbored the fear that the police might "retaliate" in some way if he provided them with inaccurate information.

Moreover, even if Detective Finkelberg's omissions were material to a finding of probable cause, Davis has not made the requisite preliminary showing that Finkelberg omitted the information either deliberately or with a reckless disregard for the truth. Davis has offered no evidence to prove Finkelberg's state of mind. Instead he asks us to infer recklessness solely from Finkelberg's alleged awareness that the tactics the police used rendered Gelestino's statements suspect.

Unfortunately, the Supreme Court in *Franks* gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that "negligence or innocent mistake [is] insufficient." *Id.* at 171, 98 S.Ct. 2674. By way of analogy, however, we can draw upon precedents in the area of libel and the first amendment. In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), *cited with approval in Herbert v. Lando*, 441 U.S. 153, 156, 99 S.Ct. 1635, 1639, 60 L.Ed.2d 115 (1979), the Court observed that reckless disregard for the truth requires a showing that the defendant "in fact entertained serious doubts as to the truth of his publication." *Id.* at 731, 88 S.Ct. at 1325. This subjective test may be met not only by showing actual deliberation but also by demonstrating that there existed "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 732, 88 S.Ct. at 1326 (footnote omitted).

Despite Finkelberg's knowledge of the tactics used against Gelestino, we do not believe the trial court should have concluded that his failure to disclose them in the affidavit amounted to a reckless disregard for the truth. First, Gelestino spoke against his own penal interest, a factor that, as discussed earlier, suggests credibility. Second, the police made an effort, albeit perhaps a meager one, to corroborate Gelestino's statements: in the officers' presence Gelestino spoke on the telephone with someone the police believed to be Davis and then, pursuant to arrangements made during that call, delivered money for past purchases to the house at 5900 Moreland Street. Although we do not approve of the police techniques used against Gelestino and agree that the corroboration was less than painstaking, the facts before us indicate that Finkelberg's failure to describe how the statements were elicited was at most negligent, but in any event not reckless.

In reaching this conclusion, we are not holding that a case never could arise in which an omission would render a warrant susceptible to attack under *Franks*. Police could take a statement so out of context or could engage in conduct so overbearing and suggestive that failure to describe these factors would constitute a deliberate falsehood or a reckless disregard for the truth. Nevertheless, we cannot require officers to describe in minute detail all matters surrounding how they have obtained statements, for such a requirement would make the process of applying for a search warrant a cumbersome procedure inimical to effective law enforcement. Moreover, such a result might encourage rather than discourage improper police behavior: facing ever more stringent requirements for obtaining warrants, police might forego applying for one whenever they think they might have a tenable case for proceeding without one. *See United States v. Ventresca*, 380 U.S. at 108, 85 S.Ct. 741. We hold only that on these facts Davis has failed to meet his burden under *Franks* of making a substantial preliminary showing that the

affidavit contained a material misstatement that was made deliberately or with reckless disregard for the truth. Without such a showing, the district court was under no obligation to hold a hearing on the question or to rule in Davis's favor.

### 3. 18 U.S.C. § 3109

■ Davis next challenges the manner in which the police executed the warrant. Specifically, he argues that the police violated 18 U.S.C. § 3109 [35] by failing to wait until they were refused admittance before they forcibly entered his house.

There was credible testimony that the police, when they arrived at the house, first announced their authority and purpose, see Transcript of Proceedings on Davis's Motion to Suppress, July 7, 1978, at 10–11 (testimony of Sergeant Gonzales) [hereinafter cited as Davis Tr.]; id. at 50 (testimony of Detective Finkelberg), that they observed lights on in the house, and that they waited fifteen to thirty seconds before entering, see id. at 11, 24–25 (testimony of Sergeant Gonzales); id. at 60–62 (testimony of Detective Finkelberg). The time that section 3109 requires officers to wait before they may construe no response as a denial of admittance depends largely on factual determinations made by the trial court. See Masiello v. United States, 115 U.S.App.D.C. 57, 58, 317 F.2d 121, 122 (D.C.Cir.1963) (Burger, J.). Given the testimony placed before him, we do not believe that Judge Oberdorfer erred in concluding that the police did not violate section 3109.

### 4. Due Process

■ Finally, Davis asserts that police misconduct so pervaded the entire sequence of events leading to the search of his house that his conviction, based on evidence obtained in that search, offends due process. Although the police's treatment of Gelestino was far from exemplary, we have held that this misconduct violated no right of Davis under the fourth amendment. We likewise conclude that the fifth amendment does not require a different result.

In essence, Davis asks us to do indirectly, through the fifth amendment's due process clause, what the fourth amendment's law of search and seizure does not permit us to do directly. We believe, however, that the fourth amendment, as construed by the courts, strikes the balance on the question of admissibility. In this case, that balance favors admission of the evidence, and we will not upset it under another name. Excluding evidence here under a due process theory would exact the same high price as would its exclusion under the fourth amendment: although we might be deterring police misconduct in an indirect way, we would be keeping relevant and reliable physical evidence from the trier of fact. See e. g., Rakas v. Illinois, 439 U.S. at 137, 99 S.Ct. 421; United States v. Calandra, 414 U.S. 338, 348–52, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The same prudential concerns that under the fourth amendment have limited application of the exclusionary rule to those whose privacy the government has invaded now lead us to conclude that a new exclusionary rule, grounded nominally in due process, would not serve the interests of justice.[36]

### B. Voluntariness

Davis also would have us reverse his conviction because the trial court admitted into evidence statements he made during the search of his house, statements that he alleges were the product of coercion. Use of any statement Davis made involuntarily

---

**35.** This section provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109 (1976).

**36.** Davis's argument might have carried more weight had the police misconduct been so extreme and outrageous as to shock all sense of justice. See Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The case before us, however, is not such a case.

would offend due process and require a reversal, even if other evidence would support his conviction. *See, e.g., Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Thus, our review focuses entirely upon whether Davis's statements were the product of his free will.

Davis bases his claim of involuntariness on the conduct of the police during the search of his house. Specifically, he points to several factors: the officers entered after 2:00 a.m.; they used a battering ram to gain entry; their weapons were drawn as they entered; they conspicuously carried one or more crowbars, instruments that might damage his property; they opened drawers throughout the house; and they indicated that valuable personal property might be damaged during the search if he did not cooperate.[37] The agglomeration of these events, Davis contends, put him in fear of losing valuable property and overcame his free will; the officers' conduct, he argues, amounted to coercive extraction of incriminating statements.

■ No search can be pleasant for the homeowner. It undeniably represents an intrusion into his privacy, but the intrusion is one that society has elected to accept. Using force to enter is to be expected when, after knocking, the police are not admitted freely. The narcotics business often is a violent one, and police executing a warrant to search for narcotics understandably would have their weapons drawn when entering without consent. Furthermore, the proper execution of a warrant demands a thorough search of the premises. Even if conducted with due care for preserving the homeowner's possessions, any complete examination necessarily carries with it some risk of damage. Narcotics in particular

may be hidden in very small places, so an effective search in this case would require a painstaking examination of most of the property in Davis's house—including his pinball machines.[38] At bottom, then, Davis is contending that the prospect of a thorough search overcame his free will. We cannot accept this argument without finding coercion in almost every instance of an unconsented search conducted pursuant to a lawfully issued warrant. We decline to hold that cooperation with the police, after they enter legally and after the homeowner realizes that they have the right to go through his possessions, is, without more, involuntary.

■ Some of Davis's allegations, however, go beyond the standard procedures that police must employ to conduct an effective search. He suggests that the officers deliberately made him fear excessive and unnecessary damage to his property, in particular his several pinball machines, this conduct amounting to psychological coercion. Testimony conflicts on whether the police threatened to destroy the machines or whether they indicated simply that a search of these potential hiding places would be difficult and time consuming. *Compare* Davis Tr., *supra* at 19 (testimony of Sergeant Gonzales) *with id.* at 79–80, 85 (testimony of Davis).[39] After hearing these contradictory reports and questioning Sergeant Gonzales himself, *see id.* at 42–45, Judge Oberdorfer denied the motion to suppress, finding that Davis's statements were voluntary. To reach this result, Judge Oberdorfer must have believed that the officers' account more accurately depicted what had transpired. We cannot say that such a conclusion of fact is clearly erroneous.

We also must bear in mind that Davis made his statements after Officer Gonzales and Detective Finkelberg separately had

---

**37.** Davis also asserts that he was wearing only undershorts when the police entered and that they questioned him while he still was almost totally unclad, *see* Brief for Appellant Davis at 9, 34, but there is no support for this in the hearing testimony. Even if the record established his story, however, we doubt that it would change our result in this case.

**38.** Davis admitted that each pinball machine could conceal large amounts of narcotics. Davis Tr., *supra* note 6, at 85.

**39.** *See* note 38 *supra*.

advised him of his *Miranda* rights, rights that Davis admitted he understood.[40] Surely, as an attorney, Davis already knew that he could remain silent and obtain counsel before speaking. Of course, a coercive atmosphere can arise despite a declarant's awareness of his rights. On a different set of facts, we might be willing to conclude that police elicited statements coercively even though the statements followed the giving of *Miranda* warnings. On the facts before us now, however, we are not prepared to find that the officers' actions overpowered Davis's free will and caused him to speak involuntarily.

## IV. CONCLUSION

The police officers' entry into Gelestino's apartment and their questioning of him there were clearly unlawful. Judge Jones rightly suppressed the tangible evidence the police seized and the statements Gelestino made at the time, an action that serves the deterrent functions for which the exclusionary rules under the fourth and the fifth amendments were designed. Suppression of all evidence—Gelestino's grand jury testimony, the tangible evidence seized in the Davis search, and Davis's own statements—would carry deterrence too far. It would exclude evidence that the police obtained either without invading the privacy rights of the defendant in question or by actions far removed from the initial governmental misconduct. Neither the fourth amendment nor due process dictates this result. Accordingly, the convictions of Davis and Gelestino are

*Affirmed.*

**40.** Davis could not testify with certainty concerning when the police first advised him of his rights completely. *See* Davis Tr., *supra* note 6, at 79. Detective Finkelberg stated that he advised Davis of his rights as soon as he encountered him inside the house, *id.* at 49, and Sergeant Gonzales testified that he informed all those present of their rights once he had assembled them in a central location, *id.* at 15. Davis does not allege, nor does any testimony indicate, that he made any statements introduced at trial before the warnings were given. Moreover, Davis himself admitted at the hearing that at the time he made the statements in question he understood that he had the right to

remain silent, that any statement he made could be used against him, and that he could have an attorney present. *Id.* at 83–84, 90. Gonzales testified:

Mr. Davis, he just talked and you couldn't shut him up. That is a terrible way to put it, but the man just talked and talked. You would ask him a question—I even advised him of his rights over and over throughout the night, one time after another. At least, within the first hour, I had personally advised him of his rights at least three times, even though I understood he knew it the first time. *Id.* at 38.