PEARSON v. STATE.

(In Banc. April 20, 1936. Suggestion of Error Overruled May 18, 1936.)

[167 So. 644. No. 32086.]

10

Pat **D. Holcomb** and **Edward W. Smith**, both of Clarksdale, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

Argued orally by **Pat D. Holcomb**, for appellant, and **W. D. Conn, Jr.**, for the state.

**Ethridge, J.**, delivered the opinion of the court.

The appellant, Fedro Pearson, was jointly indicted with Roosevelt Moon in the circuit court of Coahoma county, for the murder of J. C. Parker, a white man about seventy years of age, who operated a small grocery store, on May 20, 1935; said store being situated about a mile from Clarksdale on the Friars Point road. There was a severance and this appeal is by Pearson. When the indictment was returned by the grand jury, one Pat D. Holcomb, an attorney of the Clarksdale Bar, was appointed to defend Pearson, and another was appointed to defend Moon.

At the September, 1935, term of the circuit court, the grand and petit juries for the term were made up in accordance with section 2039, Code 1930, having been drawn in conformity with the statute.

The attorney for the appellant filed a motion to quash the indictment and the jury so drawn, on the ground that members of the Negro Race were omitted from the jury box, and that it was a habitual practice in making up jury boxes of the county to discriminate against the Negro Race by leaving them off the list of jurors so selected. The appellant is a member of the Negro Race. The trial court heard evidence upon this motion to quash the indictment, and the court, having found that no name of a member of the Negro Race had been placed in the jury box for several years past, sustained the motion, and in accordance with the provisions of section 2060, Code 1930, ordered that a jury be summoned from the qualified electors of the whole body of the county. In accordance with this order of the court, the sheriff summoned a new jury and a second indictment was returned against the defendants. Thereupon, the same attorney who moved to quash the indictment, when it was first

returned by the first jury, moved to quash the second indictment upon the ground that the jury was not drawn from the jury box of the county, and that the court had no right to quash the jury box made up from which the grand jury was drawn, but only had the power to quash the indictment and dismiss the grand jury so drawn, and that appellant had the right to have a second grand jury drawn from the jury box as made up. This motion to quash was overruled by the court, which action of the court constitutes one of the principal assignments of error in the case.

Section 264 of the Constitution provides that no person shall be a grand or petit juror who is not a qualified elector, and able to read and write, but that the want of such qualification in any juror shall not vitiate any indictment or verdict, and that the Legislature shall provide for procuring a list of persons so qualified, and the drawing therefrom of grand and petit juries for each term of the circuit court. Section 2029, Code 1930, provides who are competent jurors and reads as follows: "Every male citizen not under the age of twenty-one years, who is a qualified elector and able to read and write, has not been convicted of an infamous crime, or the unlawful sale of intoxicating liquors within a period of five years and who is not a common gambler or habitual drunkard, is a competent juror," etc. Section 2033, Code 1930, provides for a list of jurors to be made up by the board of supervisors at their first meeting in each year, said list to cover twelve months, and that in so doing they shall use the registration books of voters, and shall select qualified persons "of good intelligence, sound judgment, and fair character." It also provides that the board of supervisors shall order the jury box to be emptied of all names therein, and the same to be refilled from the jury list as made by them at said meeting, and that the clerk shall put the names of jurors from each supervisor's district in a separate box or compartment kept for the purpose, which is to be kept locked,

closed, and sealed, except when juries are drawn. It is provided by section 2038, Code 1930, that after the expiration of twelve months, the clerk shall make a list of the names of persons in the list who did not serve as jurors during the year, deliver this list so made, duly certified, to the clerk of the board of supervisors, and this shall constitute a part of the list of jurors for the ensuing year, unless the supervisors, for reasons deemed good, cause some of the names to be omitted from the list. By section 2039, Code 1930, it is provided that at each regular term of the circuit court, and at a special term if necessary, the judge shall draw from the small boxes inclosed in the jury box slips containing the names of fifty jurors to serve as grand and petit jurors for the first week, and thirty to serve as petit jurors for each subsequent week of the next succeeding term of court. It is then provided by section 2040, Code 1930, that the clerk shall keep the names which the judge has drawn and placed in envelopes without opening, until within fifteen days of the term for which the jurors were drawn, and shall then, in the presence of the sheriff and clerk of the court, open the envelopes and make a list of the names in each, which list shall be certified by these officers to be correct, and the clerk of the court shall then issue and deliver to the sheriff separate venire facias for each week, returnable on the proper day.

The design of these sections is to have men of proper qualification and character, and to have them selected from the various districts of the county in such manner as to avoid any manipulation in the drawing and summoning of jurors.

The appellant moved to quash the indictment on the ground that the grand jury was illegal and constituted fraud under the decision of the Supreme Court of the United States in the case of Norris v. State of Alabama, 294 U. S. 587, 55 S. Ct. 579, 79 L. Ed. 1074, and, as stated, the court, after hearing the evidence, sustained the motion, and in so doing it necessarily found that the whole

jury box was illegal and tainted with fraud. The court, thereupon, ordered a venire to be issued from the regular voters of the county in accordance with law, which we consider was the legal and proper course to be pursued in such a case.

We do not think the appellant is in a position now to challenge the legality of this proceeding on the ground that the grand jury should have been selected from the jury box as made up. The jury box was either legal or illegal. There is no showing that the jury box was, in fact, made up legally, and we are of the opinion that the appellant could not so contend after having invoked the quashing of the grand jury. The appellant has no right, after so doing, to demand that a new jury be drawn from this same jury box. Counsel for the appellant, no doubt, found himself, in the second instance, in a worse condition than at first. It is not always wisdom on the part of an appellant to insist upon technical rights, and that the lists were not made up in conformity with the sections above mentioned, and that negroes were left out of the jury box, if the jurors so selected have the proper qualifications to make good jurors. When the lists are made up from the registration books, it is often the case that less desirable jurors would be selected, and that they would be selected at a time when a particular trial was to take place in the courts. It would be an easy matter, but for these statutory provisions above mentioned, for an officer to summon jurors, in cases of heinous crimes, who would have more of a tendency to convict persons charged with crime, than a jury selected at a time when no court is sitting and when no particular case is set for trial.

The appellant and his attorney cannot complain of that which they have procured. The whole jury box was either legal or illegal, and no question is presented now as to the soundness of the decision of the judge in quashing the first indictment. The appellant's present contention is that he had a right to elect, and if he want-

ed the second jury drawn from the same box, he had a right to have this done.

We do not think there is any merit in this contention or that it is sound. If the jury box was illegally made up, the court had the power to quash it. In quashing the indictment and the grand jury which returned it, the court was authorized to quash the entire jury box. It was also shown that in drawing the jurors from the small boxes representing the supervisors' districts—selecting the grand and petit juries from the box before the first indictment was quashed—in three of the small boxes there were not any names left. It is manifest that the court was correct in refusing to quash the second indictment. There is no allegation or contention that the jurors summoned under order of the court were, in any manner, illegal, or that fraud was perpetrated in the selection and summoning of these jurors.

Counsel also contend that when the second indictment was returned, he requested additional time to prepare for the trial, and that the court erred in refusing to grant such time. Counsel takes the position that his first appointment to defend the appellant did not impose upon him any further duty after the indictment was quashed, and that on the second indictment he was entitled to the same indulgence he had in the first and he claims that the appellant was denied the right of counsel within the meaning of Powell v. State of Alabama, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527. Counsel is mistaken in assuming that he was under no duty after the quashing of the first indictment, as to his appointment, to defend the appellant. He was under the duty of defending the appellant until the case was disposed of on its merits. The first appointment devolved upon counsel the duty to fully investigate the case as far as he could and prepare for the ultimate trial on the merits, and he was not to rest after securing the quashing of the first indictment. His duty was to investigate the case in all its bearings, and to use diligence in ascertain-

ing all the facts. In the case of Giles v. State, 150 Miss. 756, 116 So. 887, 888, this court said that: "Under the law, it is the duty of a defendant to prepare for his trial as speedily as he reasonably can; but if he had more than a week to arrange for his trial and failed to secure an attorney within that time, it would require an extraordinary showing of circumstances to compel the court to further delay the trial. The record contains no such showing, and there was nothing to show that the attorney who defended the appellant was not sufficiently advised of the facts to make a proper defense."

In the case at bar, there is no showing that counsel could have secured any additional advantage had he secured such indulgence of further time from his first appointment until the second indictment. Circuit courts are held only for limited periods, and business must be dispatched with reasonable speed in order that justice may be administered, and there is no showing that injustice resulted to the appellant from the overruling of the motion for additional time. It appears that counsel conducted the case with knowledge of the material facts, and had ample opportunity to learn all that was material. We are, therefore, of the opinion that there was no error in this regard.

On the trial on the merits of the case, one Henry Shannon was introduced as a witness for the state, and it appeared that he had also been indicted for some participation in the crime, but just what the indictment was is not disclosed from the record. It appeared from Shannon's testimony that Pearson and Moon contacted him prior to the killing and he had some conversations with them; that they wanted money to get away from Clarksdale, and tried to sell him a suit of clothes; that they made inquiries of Shannon as to places or stores where they could secure money; and that the nature of their inquiries indicated a purpose to take money from some storekeeper or person by some improper method. Among the stores near Clarksdale which

Shannon told Pearson and Moon about was the store of Parker on the Friars Point road. After having this conversation prior to the killing, Pearson returned to Shannon's house, according to his testimony, and Pearson's clothing was wet and he secured some clothes from Shannon and left some clothing in Shannon's house to be kept until Pearson returned, or Shannon heard from him. Shannon also testified that Pearson said the bloodhounds had been running him, and that Parker had been killed. Some of the statements alleged to have been made by Moon were challenged by Pearson, but they do not appear to have been such as were so hurtful, or so prejudicial, as to require a reversal of the judgment. Shannon's testimony strongly tends to connect Pearson with the murder of Parker.

N. A. Cartledge also testified to finding that Mr. Parker had been killed, and as to his effort to trail the assassins with dogs, and that the dogs did trail in the direction of the bridge near where some clothing was afterwards found. Some of the clothing had been burned by Shannon to keep the officers from locating same. Cartledge testified that the dogs then lost the trail on account of a heavy rain coming up, and his testimony only shows that whoever did the killing fled in the direction of the bridge, and had on clothes similar to those worn by Pearson on the evening prior to the killing. I think the testimony of Cartledge was sufficient to tend to prove the appellant's participation. It is true that standing alone it would have little weight. Testimony in reference to the bloodhounds and their qualifications is rendered immaterial because they lost the track and were unable to locate the person trailed.

Another witness, Frank Hamilton, was introduced. He participated in the investigation of the killing, in the tracing of Pearson, and in arresting him, and testified to certain conversations which took place when Pearson was arrested, and to the recovery, from one to

whom Pearson sold it, of the pistol of the deceased, Parker.

Parker was murdered with his own pistol, and after the killing, it was turned over by Pearson to another for fifty cents. Hamilton and others went to the jail with three pistols; laid them out before Pearson, and asked him to pick out Parker's pistol. He did this, selecting the correct pistol. There were two shots fired from the Parker pistol at the time of the murder, and the pistol, when delivered by Pearson to the other negro for fifty cents, and when secured by the officers, had two discharged cartridges. Pearson made statements to Hamilton and the officers, at that time, as to the transaction, and some of these were made in the presence of Roosevelt Moon, and they disagreed about what happened, as to who took the pistol from Parker, but they both agreed that they participated in robbing Parker, and that two shots were fired. One shot was found in the ceiling, and the other in the breast of Parker, and, according to the witness who examined Parker, it was fired from such distance that Parker's clothing was not powder burned. Pearson's confession was to the effect that the pistol was discharged in a struggle over it, and the testimony showed that this confession was free and voluntary. It is argued, however, that the court admitted evidence showing that, in conversations about how the killing occurred, Roosevelt Moon charged Pearson, and Pearson charged Moon, therewith. They were together and each went to the store for the purpose of securing money, and they undertook to disarm and rob Parker. Under these statements, they were both participants in the murder.

J. C. Sligh, official court reporter of that district, went with the district attorney, and took down in shorthand statements from Fedro Pearson, and Roosevelt Moon, and Henry Shannon, but had not transcribed them. Sligh was called as a witness and read to the jury the conversation with Pearson from his shorthand notes.

It was objected to as being a written confession which had not been submitted to the appellant as to its correctness, and that it was inadmissible in evidence. It is only where justices of the peace, at preliminary hearings, or other persons, are required to take down in writing the substance of statements made by defendants, that such statements are inadmissible until signed by the defendants; but that principle is not applicable here. In effect, Sligh was merely delivering statements made in his presence which he took down in shorthand. It is permissible for a witness who has made a memorandum in writing on the hearing to refresh his memory by reading it, if he has testified as a witness as to the correctness of the matter.

We have carefully considered all the assignments of error, and, after full consideration, we find no reversible error in the judgment of the court below; and it will therefore be affirmed.

Affirmed, and June 10, 1936, fixed as the date for the execution of the sentence.