455 So.2d 796 (1984)
Timothy Lenwood GARDNER
v.
STATE of Mississippi.
No. 54204.
Supreme Court of Mississippi.
September 5, 1984.
*797 Tyree Irving, Walls, Buck & Irving, Greenville, for appellant.
Bill Allain, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
WALKER, Presiding Justice, for the Court:
This is an appeal from the Circuit Court of Tallahatchie county, wherein the appellant was convicted of armed robbery and sentenced to serve a term of 15 years in the custody of the Mississippi Department of Corrections. From this conviction the appellant perfected an appeal to this Court and assigns as error the following:
I. The Court erred in permitting rebuttal witness, Jay Clark, to answer questions by reading from his notes.
II. The Court erred in permitting the state, on cross examination of Richard L. Gardner, to represent to the jury that the defendant had given a written statement, and in allowing the State to use a purported written statement in cross-examination of the witnesses.
III. The Court erred in not granting a mistrial when the prosecutor asked a defense witness the following question: "And you have no explanation for Tim's statement to the officers that Dick told him `We did it'".
IV. The verdict is against the overwhelming weight of the credible evidence.
V. The Court erred in permitting into evidence Exhibits S-1 through S-4 because they are not relevant to the charge and are of an inflammatory nature.
On March 11, 1981 Mr. O.M. Martin was found shot to death at his Charleston scrap iron business. Mississippi Highway Patrol Investigators Jimmy Dees, A.D. Gatewood, and Jay Clark were dispatched to the scene. Through their investigation they learned that John Earl Booker, Kermit Jones, and Tim Gardner, the appellant, had been seen at the scrapyard that day.
On March 12, 1981 Investigators Gatewood and Clark questioned the appellant. Also present was Mr. Richard Gardner, Tim's grandfather. The officers informed Tim of his constitutional rights, and he agreed to waive these rights and make a statement. Since Tim was only 14 years old, the officers asked Mr. Richard Gardner if he had any objections to Tim making a *798 statement. Mr. Gardner responded that he had no objections. Thereafter, the officers questioned Tim and took notes on what he said. No tape recording was made of the interview.
At trial, Investigator A.D. Gatewood appeared on behalf of the State. He testified that during the March 11, 1981 interview Tim told the following story: Two days before the robbery and shooting of Mr. Martin, the appellant, along with John Earl Booker and Kermit Jones, planned to rob Mr. Martin. On the morning of the robbery, they went to the scrapyard, where they helped a customer of Mr. Martin's load tin onto a truck. They then left the scrapyard and went to a nearby Sonic drive-in restaurant. After getting something to drink, the three returned to the scrapyard. Tim entered through the front to see if everyone had left. He was told by Mr. Martin to leave, and exited via a path in the rear of the yard. He did not see Booker or Jones and went on home. Later that day he went to Kermit Jones' house. Kermit told him that they had "done it". Booker and Jones then gave him $100.00 and told him to keep his mouth shut.
Kermit Jones also testified on behalf of the State. He stated that Booker had told him and Tim of a man with lots of money. Booker needed help robbing the man, and both Kermit and Tim agreed to help. Tim's duty was to enter through the front of the scrapyard and get Mr. Martin to go around to the back. On the day of the robbery, Tim entered the scrapyard as planned, but was not present when the robbery or the killing occurred.
Mr. Richard Gardner testified on behalf of the defendant. He testified that he was present when investigators Clark and Gatewood questioned his grandson, but never heard Tim admit that he helped plan the robbery.
The defendant took the stand on his own behalf and testified that he did not assist in the planning or the commission of the robbery. On the day of the robbery, he and Kermit Jones were supposed to go to the Smoky community to meet some girls. When he went to Kermit's house that morning, Kermit stated that he had to go to Martin's scrap iron place with John Earl Booker to get some parts for Booker's car. Kermit suggested that Tim go with them and they would leave for Smoky afterwards. They went to the scrapyard, where they helped a man load tin onto a truck and were paid $7.50 each. They took the money and went to the Sonic for lunch. After they finished eating, Booker stated that he had forgotten to get the parts for his car and needed to go back to the scrapyard to do this. Tim said that he would go on home and wait for Kermit, but Kermit persuaded him to go with them to the scrapyard. When they got there, Booker pulled out a gun, stating that he intended to sell it. He asked Tim to go look for a man with a "good buddy" cap on. Tim went through the front entrance to the scrapyard, and saw Mr. Martin welding at the back of a truck. A mini-bike frame that he had been wanting for some time caught his attention, and he went to look at it. When Mr. Martin asked what he wanted, Tim replied that he would like to buy the mini-bike frame. Mr. Martin told him to come back the next day and he would see what he could do. Tim then exited through a path in the rear of the scrapyard. Since he did not see either Booker or Jones, he assumed that they had left. He then followed the path home.
Later that day Tim went to Kermit's, but was told by his sister that he was not there. That same afternoon he went to play basketball and passed Kermit's house on the way. Kermit was out front and motioned him to stop. He went over to meet Kermit, who told him that "we did it". Kermit then went on to explain that they had robbed Mr. Martin and that Booker had taken some $400 from him. Booker then came out of the house and caught the two of them talking. He gave Tim $100 and told him that he was to keep his mouth shut. Booker still had the gun, and threatened both Kermit and Tim if they said anything about the robbery or the killing. *799 This was the first that Tim had heard of the killing.
The next day Tim went with his grandfather to City Hall to talk to the police. He voluntarily gave a statement, but never told the officers that he had helped plan the robbery two days before it happened. What he did tell the officers was this: After the robbery Kermit told him that Booker had stated two days before the robbery that he planned to rob Mr. Martin, but Kermit did not believe him.
After hearing all of the evidence, the jury returned a verdict of guilty.

I.
On appeal, the appellant first complains that the court erred in permitting rebuttal witness, Jay Clark, to answer questions by reading from his notes. The appellant contends that using the notes in this manner was improper, since the notes were not admitted into evidence. Further, he contends that reading the notes was neither present recollection revived nor past recollection recorded. The State agrees that the notes do not constitute past recollection recorded, but argues that use of the notes by Investigator Clark did qualify as present recollection revived.
The general rule regarding the use of memoranda or notes to refresh present recollection is set forth in Torcia, Wharton's Criminal Evidence (13th ed. 1973) § 416:
A memorandum may so stimulate the memory of a witness as to permit him to testify on the basis of a present recollection. The memorandum may be used for this purpose even though it would not itself have been admissible in evidence. The witness, whose memory is thus being refreshed, must know that the facts set forth in the memorandum were correctly stated therein.
Since it is not the memorandum that is the evidence, but the recollection of the witness, the author of the memorandum may be a person other than the witness.
The memorandum used to refresh a witness' present recollection need not be an original writing; a mere copy of the original is sufficient. Indeed, when a copy of a memorandum has been used, the original need not be produced.
According to some courts, a memorandum to refresh a witness' present recollection may be used only if it was made at or about the time of the event recorded. Other courts require merely that it be made at a time when the facts were fresh in the witness' mind. Under another view, if the witness' memory is actually refreshed by the use of a memorandum, thereby enabling him to testify on the basis of present recollection, it matters not when the memorandum was made.

Since it is the witness' present recollection, not the memorandum, which is the evidence, the memorandum itself is not admissible, nor may the contents thereof be read to the jury. ... (Emphasis added)
Unlike the general rule, Mississippi has not prohibited a witness from reading his memorandum to the jury. In Pearson v. State, 176 Miss. 9, 167 So. 644 (1936), the State called to the stand a court reporter who had been present when the defendant made statements to the district attorney. The reporter took shorthand notes of the statements and read to the jury from these notes. Affirming the trial court's decision to allow the reporter to read the notes to the jury, this Court stated:
In effect, Sligh was merely delivering statements made in his presence which he took down in shorthand. It is permissible for a witness who has made a memorandum in writing on the hearing to refresh his memory by reading it, if he has testified as a witness as to the correctness of the matter.
176 Miss. 23, 167 So. 644. A similar issue was before the court in the more recent case of King v. State, 342 So.2d 892 (Miss. 1977). In that case the defendant signed a waiver of his Miranda rights, and then agreed to answer questions asked by the Winona Chief of Police. A secretary was present during the questioning and took shorthand notes of what transpired. At *800 trial the Chief of Police used a transcription of the secretary's shorthand notes to refresh his memory. On appeal, this Court held that the statement was properly admitted, noting that any questions regarding the accuracy of the statement were for the jury to resolve.
From these cases it is clear that Mississippi does allow a witness to read to the jury from notes used to refresh his memory. Accordingly, the appellant's first assignment of error is without merit.

II.
The appellant next complains that "the court erred in permitting the State, on cross-examination of Richard L. Gardner, to represent to the jury that the defendant had given a written statement, and in allowing the state to use a purported written statement in cross-examination of the witness." Specifically, the appellant contends that it was error for the assistant district attorney to ask the witness: "Well, you've had the statement that was taken and reduced to writing. You know what I am referring to, don't you?"
On direct examination by defense counsel, Mr. Gardner testified that the officers had a pen and yellow pad and were taking notes when they questioned Tim. Furthermore, the officers testified that they took notes, and these notes were later reduced to typewritten form. Under these circumstances there was no implication that Tim had given a written statement. Accordingly, no prejudice resulted to the appellant from this question or the use of the notes by the prosecutor.

III.
The appellant next contends that the court erred in not granting a mistrial when the prosecutor asked a defense witness the following question: "And you have no explanation to members of this jury for Tim's statement to the officers that Dick told him `We did it'?" When the prosecutor asked the question, defense counsel objected and the objection was sustained by the trial court. Defense counsel then made a motion for a mistrial, which was overruled.
Since the trial judge sustained the first objection, no prejudice resulted to the appellant from the question. This court has held that where an objection to a question is sustained and no request is made that the jury be instructed to disregard the question, there is no error. Reddix v. State, 381 So.2d 999 (Miss. 1980); Clanton v. State, 279 So.2d 599 (Miss. 1973).

IV.
The appellant next contends that the verdict is against the overwhelming weight of the evidence. This assignment of error is without merit, as there was sufficient testimony to link the appellant with both the planning and commission of the robbery, if believed by the jury, which evidently they did.
Finally, the appellant contends that the court erred in permitting into evidence exhibits S-1 through S-4 because they are not relevant to the charge and are of an inflammatory nature. These exhibits are photographs of the crime scene, and were also in issue in the case of Booker v. State, 449 So.2d 209 (Miss. 1984). In that case we held that the photographs were not gruesome or likely to arouse the emotions of the jurors. As in Booker, the trial court properly overruled the appellant's objections to the introduction of these photographs.
For the above reasons, the judgment of the Circuit Court finding the appellant guilty of armed robbery is affirmed. However, in view of the fact that the appellant was only fourteen years of age at the time of the commission of the crime and was only fifteen years of age at the time of sentence, justice requires that the trial court consider alternative sentences provided for under the Youth Court Act and *801 make a record of that consideration and ultimate findings as outlined in May v. State, 398 So.2d 1331 (Miss. 1981).
For this reason, this cause is reversed and remanded to the trial court for further proceedings consistent with this opinion on the question of sentence only. Affirmed as to guilt.
AFFIRMED AS TO GUILT; REVERSED AND REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION ON THE QUESTION OF SENTENCE ONLY.
ROY NOBLE LEE, P.J., and BOWLING, HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
PATTERSON, C.J., takes no part.