# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-KA-00368-SCT

*CHARLIE McGOWAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/13/96 |
| TRIAL JUDGE: | HON. WILLIAM F. COLEMAN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CHARLES W. MARIS, JR. |
| DISTRICT ATTORNEY: | ED PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/11/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 1/2/98 |

**BEFORE SULLIVAN, P.J., ROBERTS AND SMITH, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Charlie McGowan was convicted of capital murder, three counts of armed robbery, and two counts of aggravated assault in the Circuit Court of the First Judicial District of Hinds County. McGowan was sentenced to serve life without parole, life, and four twenty year terms, respectively, in the custody of the Mississippi Department of Corrections.

¶2. McGowan now appeals the trial court's denial of his motion to suppress his confession, motion to suppress other statements made after a guilty plea was entered but later vacated, challenges for cause of seven veniremen, and motion for mistrial. In response, the State argues that the trial court did not commit any reversible error.

## FACTS

¶3. Charlie McGowan, along with three other individuals, conspired to rob the Fabra Care Cleaners located on Nakoma Drive near Hanging Moss in Jackson. The individuals entered the cleaners from

the rear and ordered three employees to the floor. One of the individuals assumed command and proceeded to the front of the store where he emptied the cash drawer. The robbers next expropriated the employees' purses and commenced to flee, but not before one of the robbers, Frederick Burton, shot the three employees laying on the floor. The gunshot to one of the employees, Mrs. Sheila Johnson, caused her death.

¶4. Subsequently, police obtained information that McGowan may have been involved in the robbery. Police arrested McGowan on a separate arrest warrant for armed robbery and took him to the police station. While at the police station, McGowan was given his *Miranda* warnings, signed a waiver form, and confessed to his involvement in the Fabra Care robbery. Before trial, McGowan filed a motion to suppress his confession alleging that he did not knowingly, intelligently, and voluntarily waive his rights against self-incrimination. After a hearing on the motion, the trial court denied the motion finding that McGowan's testimony was inconsistent and that the statements were "voluntarily, knowingly, and intelligently given after a full advice of his rights and a full understanding of those rights."

¶5. Prior to trial, McGowan also entered into a plea bargain where in return for his cooperation and testimony against the other robbers at any subsequent trial he could plead guilty and receive a recommended lighter sentence. On September 20, 1995, a guilty plea was entered and accepted by the trial court, and McGowan was sentenced according to the recommendations by the district attorney. After McGowan later refused to testify and invoked his Fifth Amendment right against self-incrimination at the trial of one of the other individuals, the State made a motion to have the guilty plea vacated. The guilty plea was subsequently vacated by the lower court, and the original charges were reinstated against McGowan. Before trial, McGowan made a motion to suppress statements given to an investigator for the district attorney's office after the guilty plea was entered on the grounds that the statements were part of the plea bargain. The trial court denied the motion finding that the statements were given after the guilty plea and entry into evidence would not have "any damaging effect on plea negotiations and plea bargains."

¶6. After trial, the jury found McGowan guilty of capital murder, three counts of armed robbery, and two counts of aggravated assault. McGowan was subsequently sentenced to serve terms of life without parole, life, twenty years, twenty years, twenty years, and twenty years, respectively, in the custody of the Mississippi Department of Corrections.

¶7. Aggrieved by the lower court's conviction and sentencing, McGowan appeals to this Court and assigns the following issues as error:

> **I. WHETHER THE TRIAL COURT ERRED IN NOT SUPPRESSING MCGOWAN'S STATEMENT GIVEN TO POLICE OFFICERS.**
>
> **II. DID THE TRIAL COURT ERR IN NOT SUPPRESSING THE STATEMENT OF MCGOWAN GIVEN TO THE HINDS COUNTY DISTRICT ATTORNEY'S OFFICE?**
>
> **III. WHETHER THE TRIAL COURT ERRED IN NOT STRIKING FOR CAUSE CERTAIN JURORS.**
>
> **IV. WHETHER THE TRIAL COURT ERRED IN NOT GRANTING MISTRIAL**

**WHEN THE PROSECUTOR ATTEMPTED TO INTRODUCE INFLAMMATORY CHARACTER EVIDENCE MULTIPLE TIMES FOLLOWING THE COURT'S EXCLUSION OF THE SAME.**

## DISCUSSION OF LAW

### I. WHETHER THE TRIAL COURT ERRED IN NOT SUPPRESSING MCGOWAN'S STATEMENT GIVEN TO POLICE OFFICERS.

¶8. McGowan contends that because of his youth, mental weakness, lack of understanding, inability to read, low IQ and retardation he was unable to waive his constitutional rights against self-incrimination and for the presence of counsel. At a pretrial suppression hearing, McGowan presented testimony from two of his special education teachers that he read at a level between fourth and fifth grade during the 1992-1993 school year. McGowan also presented testimony that he had an overall IQ of 55. McGowan testified at the suppression hearing that he was scared and started crying during the questioning by Detectives Gerald Jones and Jim Jones. McGowan stated that Detective Gerald Jones told him that he was going to get the death penalty and that he was afraid that if he did not talk that he was going to get the death penalty at that time. McGowan also testified that he was told to sign the statement and waiver form, that the form was not read to him, and that he did not, and could not, read the warning statement himself.

¶9. The State presented testimony from Detectives Gerald Jones and Jim Jones who participated in the questioning of McGowan. Detective Gerald Jones testified that he advised McGowan of his *Miranda* rights. In order to ensure that McGowan understood what was happening, Detective Gerald Jones had McGowan read the first line of the warnings and asked him if he understood. Then, Gerald Jones read each remaining line asking McGowan if he understood each line. Gerald Jones testified that McGowan answered that he did understand the rights. After reading the *Miranda* warnings, Gerald Jones read the waiver form to McGowan and asked him if he understood and McGowan replied that he did understand and signed the form. Gerald Jones testified that there was nothing about McGowan's appearance, expressions, or statements that indicated that he did not understand what he was doing. Gerald Jones also testified that McGowan indicated that he would talk without an attorney present. Gerald Jones further testified that no promises of leniency, threats, or coercive measures were exerted against McGowan.

¶10. After waiving his rights, McGowan made a statement indicating his presence at the Fabra Care robbery and that when the gunshots were fired he became frightened and ran away. Detective Jim Jones testified that after the statement was given it was typed onto a sheet of paper and read to McGowan. After reading the statement to McGowan, Detectives Gerald Jones and Jim Jones and Charlie McGowan signed the statement.

¶11. Where the trial court has overruled a motion to suppress the confession of a defendant, this Court will reverse the trial court's decision only if the trial court's ruling "is manifestly in error or contrary to the overwhelming weight of the evidence." *White v. State*, 495 So. 2d 1346, 1347 (Miss. 1986) (quoting *Cabello v. State*, 490 So. 2d 852, 856 (Miss. 1986)).

¶12. "This Court has held that there is no per se rule that mental retardation renders a confession

involuntary and inadmissable." *Blue v. State*, 674 So. 2d 1184, 1205 (Miss. 1996) (citing *Neal v. State*, 451 So. 2d 743, 756 (Miss. 1984)); *see Gator v. State*, 402 So. 2d 316 (Miss. 1981) (holding confession admissible where defendant's IQ was placed at a range between 43 and 70); *Hancock v. State*, 299 So. 2d 188 (Miss. 1974) (holding confession admissible after *Miranda* warnings were given where defendant had an IQ of 87 and was considered "dull normal"); *Dover v. State*, 227 So. 2d 296 (Miss. 1969) (holding inadmissible confession of forty-five year old defendant with IQ of 60); *Harvey v. State*, 207 So. 2d 108 (Miss. 1968) (holding inadmissible confession of eighteen year old defendant with IQ of 60 and suffering from brain damage). Instead, the mental abilities of an accused are but one factor to be considered in determining whether the confession was knowingly, intelligently and voluntarily made. *Neal*, 451 So. 2d at 756. Thus, "[w]hether there has been an intelligent, knowing, and voluntary waiver is essentially a factual inquiry to be determined by the trial judge from the totality of the circumstances." *Id.* at 753 (citing *Edwards v. Arizona*, 451 U.S. 477, 486 n.9 (1981)).

¶13. The United States Supreme Court in *Fare v. Michael C.*, 442 U.S. 707 (1979), held that an inquiry into the totality of the circumstances is necessary when determining if the statement of a juvenile during custodial interrogation is admissible. The Court stated:

> This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits--indeed, it mandates--inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Fare*, 442 U.S. at 725.

¶14. In *Foster v. State*, a suppression hearing was held to determine if the statements of a seventeen-year old defendant made during police interrogation were admissible. *Foster v. State*, 639 So. 2d 1263, 1281 (Miss. 1994). Foster testified that he was only seventeen years old at the time of his arrest and confession, that he had only an eighth grade education and that he had suffered head injuries as a young child which allegedly caused some impairment of his mental faculties at times. *Foster*, 639 So. 2d at 1281. At the suppression hearing, Foster testified that he did not understand the warnings that were given to him prior to being interrogated. *Id.*

¶15. The two arresting officers also gave testimony that Foster was given his *Miranda* warnings and stated that he understood them. *Id.* Foster was also read the form declaring waiver of the *Miranda* rights and asked whether he understood the waiver, and Foster responded that he did. *Id.* The officer also testified that they made no promises or threats nor did they coerce, intimidate or beat Foster. *Id.* The State offered into evidence Foster's tape recorded confession, a transcript of the taped confession and a hand written version of Foster's confession with Foster's signature. *Foster*, 639 So. 2d at 1281.

¶16. After weighing all of the evidence and testimony given by both sides, the trial judge concluded that Foster's confession was voluntarily given "with a knowing and intelligent waiver of his privilege

against self-incrimination." *Id.* This Court found that the trial court applied the proper standard and that the trial court's determination "was neither manifestly in error or contrary to the overwhelming weight of the evidence." *Id.*

*¶17.* Analogously, in the case sub judice, McGowan presented testimony at the suppression hearing that he had a reading level somewhere between the fourth and fifth grade and an overall IQ of 55. McGowan testified that he was afraid that if he did not talk that the death penalty would be imposed on him at that time. McGowan also testified that he was told to sign the statement and waiver form, that the form was not read to him, and that he did not, and could not, read the warning statement himself.

¶18. However, the interviewing officers stated that McGowan was advised of his *Miranda* warnings and that he responded that he understood them. The officers also read the waiver form to McGowan and stated that McGowan responded that he understood the form and subsequently signed the waiver. Detective Gerald Jones testified that there was nothing about McGowan's appearance, expressions, or statements that indicated that he did not understand what he was doing. The officers further testified that no promises of leniency, threats, or coercive measures were exerted against McGowan. The State additionally entered into evidence the typewritten confession signed by McGowan.

¶19. After hearing all of the testimony at the suppression hearing and weighing such, the trial judge stated:

> [I]t gets down to a question of who to believe, the defendant or the two police officers. And the defendant's testimony is inconsistent. It shows a very convenient memory when it's necessary for him to forget and when to remember. And the police officers are much more credible. I believe the police officers. I find that the plea was voluntarily, knowingly, and intelligently given after a full advice of his rights and a full understanding of those rights. The motion to suppress the statement given to the police officers . . . will be denied.

¶20. "Where the defendant claims to have lacked the mental capacity to understand the warning, the determination of the trial judge, who has seen the defendant on the stand, must necessarily be given great weight." *Harrison v. State*, 534 So. 2d 175, 181 (Miss. 1988) (citing *Lee v. State*, 338 So. 2d 399, 401 (Miss. 1976)). The trial judge had the best opportunity to view the defendant and to determine whether he was capable of understanding the warnings and the waiver form. The trial judge determined that McGowan was capable of understanding the warnings and that the statements he made were voluntarily, knowingly, and intelligently given. The trial court's finding thus becomes one of fact and as such "will not be reversed on appeal unless it is manifestly in error or contrary to the overwhelming weight of the evidence." *White v. State*, 495 So. 2d 1346, 1347 (Miss. 1986) (quoting *Cabello v. State*, 490 So. 2d 852, 856 (Miss. 1986)). We find that the trial court's determination of the admissibility of Foster's statement was neither manifestly in error nor contrary to the overwhelming weight of the evidence.

¶21. However, this Court has also held that when faced with an accused of limited intelligence, the trial court must inquire into the mental capacity of the accused to determine whether the accused even had the mental capacity to understand and waive his *Miranda* warnings. *See Coverson v. State*, 617 So. 2d 642, 650 (Miss. 1993) (requiring trial court to inquire: "Did he have the mental capacity

to *knowingly and intelligently* waive [his **Miranda** rights] . . . ?").

¶22. At the hearing on the motion to suppress the confession, two of McGowan's teachers Faye Hollingsworth and Catherine Johnson testified about his mental capacity.[(1)] Faye Hollingsworth taught McGowan in the seventh and eighth grades, from about 1990 to 1992. During that time, she assessed his abilities and concluded in an assessment report that he could read on a second to third grade level. This assessment was done in 1992, approximately two years before the commission of the crime. Hollingsworth opined, after reviewing the **Miranda** warnings and McGowan's statement, that McGowan would have understood all of the words in the context in which they were used except the word "coercion."

¶23. Catherine Johnson taught McGowan from middle school to the tenth grade. Referring to the 1989 and 1992 assessment reports, Johnson stated that in 1989 McGowan was assessed to be "SLD, " specific learning disabled, which generally means that he has an average or above average intelligence with problems in math or English. The 1992 assessment report concluded that McGowan was "EMR," educable mentally retarded. Johnson stated that "EMR" children had the capacity to mingle in with society but that the highest level of intelligence and understanding they generally would achieve was between third and sixth grade. Like Hollingsworth, Johnson opined that she did not believe McGowan would be able to read and comprehend the word "coercion." She also added that she believed he would have trouble with the word "waiver"; however, she concluded that he would have understood the basic **Miranda** rights, such as the right to an attorney and the right to remain silent. On cross-examination, Johnson admitted that McGowan could read short, simple sentences, but she maintained that he would have an "extremely difficult" time reading complex material and that he had problems with short term memory.

¶24. McGowan testified at the hearing as well. He claimed that, on the morning of the arrest, he had smoked marijuana laced with crack cocaine and that when he was arrested he was still high. He further stated that he confessed only after the detective told him that he was going to get the death sentence right then if he did not. He asserted that he did not understand his rights and that none of the officers informed him of his rights. Similarly, he maintained that he only signed the form because the officer told him to just sign it and that none of the officers read his confession of the crime to him.

¶25. During cross-examination, McGowan admitted that he had been "arrested" and sent to detention centers several times (three or four) before the arrest that led to the instant conviction; however, he asserted that they had never mirandized him at the detention center. He argued that the officers made up the substance of the confession (contrary to his previous testimony that he had confessed after being threatened with the death penalty) and that the only information that he provided to the officers was his name. He told the court that he could read "some things" and that he could write his name. All of McGowan's testimony was, of course, disputed by the testimony of the two police officers who questioned him.

¶26. The trial court denied the motion to suppress, finding that McGowan has a selective memory and that the police officers were more credible. However, the trial court's ruling fails to explicitly address the question whether McGowan had the mental capacity to understand and waive his rights before giving the confession.

¶27. After reviewing the record evidence, we do not have any sufficient evidence to suggest

otherwise. There was no mental examination done of McGowan. The trial court ordered a mental examination, and if an exam was done, it was not made a part of the record. Our only information regarding McGowan's mental capacity comes from the assessment reports.

¶28. The 1992 report showed that McGowan had a full scale IQ of 55; verbal IQ of 57; and performance IQ of 63. It was concluded in this report that McGowan had no problem with "language characteristics," but that he did not do well in activities which required reading instructions. The report further noted that McGowan had no problems with auditory perceptual difficulties. Moreover, the assessment report indicated that McGowan had no health-related problems that would interfere with or that should be considered when conducting intelligence and educational testing.

¶29. His reading and reading comprehension were at a second grade, fifth month level. His English, Social Studies, Science, and Writing skills were those of a fourth grader. He could recognize basic sight words, recognize and use antonyms, and identify selected abbreviations. On the other hand, it was noted that he could not interpret reading material, classify words in content area, or analyze materials that he read. Still, the assessor indicated that he could read simple sentences, and written directions, and locate facts from given materials.[2]

¶30. The 1992 assessment was conducted when McGowan was fourteen years old. He participated in the armed robbery when he was seventeen. The fact is that we have nothing before us which indicates what McGowan's mental capacity was at or around the time the crime was committed. Moreover, the 1989 assessment report indicated that when he was tested at eleven years old, his overall IQ was 78; verbal IQ was 72; and performance IQ was 88. There is no explanation in the record or the reports of the substantial drop in his IQ levels from 1989 to 1992, nor do we have the luxury of expert testimony concerning the capabilities of one with an IQ of 78, 55, or otherwise. McGowan's teacher from 1990 to 1992 testified at trial that, other than a learning disability, McGowan had no mental problems and that he possessed the ability to deal with everyday problems despite his learning disability.

¶31. Based upon the sparse information regarding McGowan's mental capacity, we find no manifest error in the trial court's denying the motion to suppress the confession. There is simply no overwhelming evidence that McGowan could *not* effectively waive his **Miranda** rights. Moreover, his testimony at the suppression hearing, in which he did in fact appear to selectively remember favorable details and forget unfavorable ones, demonstrated that he could focus on and comprehend what was happening, a conclusion noted by the trial court after the sentencing phase of the trial:

> In any capital murder case I'm required by law to observe the defendant throughout the trial so that I can make a comment on his appearance and his reactions to the trial on the report that I'm required to prepare in the event of a death penalty. So I observed the defendant throughout the trial.
>
> He's been alert, obviously understood the proceedings. He was conversing and cooperating with his attorneys. In spite of the testimony that his IQ was -- overall IQ was 85 (sic), it's obvious that the defendant is well aware of his actions and understands the nature of his actions and is in the position to control those if desired. . . . Even at a young age he displays a callous total disregard for the rights of other human beings.

¶32. Based upon the trial court's observations of McGowan throughout the trial and the fact that the jury also passed upon McGowan's capacity to validly waive his rights and confess (obviously finding that he had done so), along with the facts set out above, we conclude that the trial court did not err in denying McGowan's motion to suppress the statements given by him to the police. As a result, we find that this assignment of error is without merit.

## II. DID THE TRIAL COURT ERR IN NOT SUPPRESSING THE STATEMENT OF MCGOWAN GIVEN TO THE HINDS COUNTY DISTRICT ATTORNEY'S OFFICE?

¶33. McGowan contends that the trial court erred by allowing into evidence statements made by McGowan to the district attorney's office the day following McGowan's guilty plea being accepted and sentencing by the trial court. McGowan and the district attorney entered into a plea bargain agreement whereby in return for McGowan's cooperation and testimony against the other individuals involved in the crimes, the district attorney would recommend a lighter sentence. At the subsequent trial of one of the other individuals, McGowan refused to testify and invoked his Fifth Amendment rights against self-incrimination. As a result of McGowan's breach, the district attorney moved to have McGowan's guilty plea vacated and the original charges reinstated against McGowan, and the trial court granted the motion. Before trial, McGowan moved to have the statements made to the district attorney's office suppressed, and the trial court overruled the motion finding the statements to be made after the guilty plea was entered and admissible.

¶34. This Court has held that where a guilty plea is withdrawn and a subsequent trial is held, evidence of the guilty plea may not be used as evidence against the defendant. *Sanders v. State*, 435 So. 2d 1177, 1179 (Miss. 1983). Uniform Circuit and County Court Rule 8.04(A)(7) provides: "*Inadmissibility of Withdrawn Guilty Plea*. The fact that the defendant may have entered a plea of guilty to the offense charged may not be used against the defendant at trial if the plea has been withdrawn." U.R.C.C.P. 8.04(A)(7). This Court has also held that "statements made with and inextricably bound up with a plea" are precluded from being used against a defendant at trial. *Sanders*, 435 So. 2d at 1180. This Court went on to further include in this area of preclusion "oral statements made by the defendant to the court in the course of interrogation as the court is considering a tendered plea--should the plea be rejected, withdrawn or for any reason vacated." *Id.* The question presented here is whether statements made in accordance with a plea bargain agreement, but not made until after the guilty plea had been accepted and the defendant sentenced accordingly, should be admissible against the defendant at a subsequent trial where the defendant breached the agreement and the guilty plea was subsequently vacated.

¶35. The United States Supreme Court has declared that statements made as a result of a plea bargain are not per se inadmissible. *See Hutto v. Ross*, 429 U.S. 28, 30 (1976) (finding Eighth Circuit "erred when it held that any statement made as a result of a plea bargain is inadmissible"). Many courts have recognized as key distinctions of whether statements connected with a plea bargain agreement should be admissible at trial against the defendant after the guilty plea has been vacated the time the statements were made (before or after the plea agreement had been entered) and the side which breached the agreement. *See, e.g.*, *United States v. Davis*, 617 F.2d 677, 686 (D.C. Cir. 1979) (holding "statements made by a defendant in testimony before a grand jury pursuant to a plea agreement are not 'statements made in connection with, and relevant to' plea negotiations, offers of pleas, or pleas entered and later withdrawn"); *United States v. Stirling*, 571 F.2d 708, 730-32 (2d

Cir. 1978) (finding testimony given to grand jury day after plea agreement entered to be admissible where the defendant subsequently breached the plea agreement); *United States v. Doe*, 671 F. Supp. 205, 208 (E.D.N.Y. 1987) (holding statements made to FBI agent after cooperation agreement entered to be admissible where defendant refused to cooperate according to agreement); *Allgood v. State*, 522 A.2d 917, 927 (Md. 1987) (holding that where State breaches plea agreement, statements made by defendant after plea entered are inadmissible); *Wright v. State*, 515 A.2d 1157, 1175 (Md. 1986) (holding statements made by defendant before grand jury to be admissible where defendant breached the agreement).

¶36. In *United States v. Stirling*, one of the defendants entered into a plea bargain agreement whereby he would plead guilty and testify for the government in return for lighter penalties. *Stirling*, 571 F.2d at 730. The day after the agreement the defendant testified before a Grand Jury giving detailed and incriminating information regarding the activities in which he and his colleagues had engaged. *Id.* The defendant subsequently breached the agreement and pled not guilty at trial. *Id.* The defendant's testimony before the Grand Jury was admitted as evidence against him at trial. *Id.* On appeal, the defendant claimed "that his Grand Jury testimony was made 'in connection with' his offer to plead guilty and therefore, under Fed. R .Crim. P. 11(e)(6),[(3)](should) not have been allowed as evidence." *Id.* at 730-31.

¶37. In determining that the Grand Jury testimony was admissible against the defendant, the Second Circuit explored the policy behind Rule 11(e)(6). *Stirling*, 571 F.2d at 731. The court stated that the policy behind the rule was "'for plea bargaining to work effectively and fairly, a defendant must be free to negotiate without fear that his statements will later be used against him.'" *Id.* (quoting *United States v. Herman*, 544 F.2d 791, 796 (5th Cir. 1977)). However, the court found that since the testimony was made after plea negotiations had ended and the agreement entered into, the testimony was not part of the plea negotiations and could be admissible. *Id.* The court further found that the admissibility of the Grand Jury testimony was governed by the terms of the agreement itself. *Id.* at 732. The agreement entered into by the defendant and the United States Attorney's office provided that if the defendant violated any term of the agreement, then such agreement would be null and void, the defendant would be subject to prosecution, and any information provided by the defendant could be used against him. *Id.* The court concluded its justification of allowing into evidence the Grand Jury testimony by stating:

> Schultz voluntarily negotiated his plea agreement, voluntarily appeared before the Grand Jury, and voluntarily decided to violate his plea agreement. He could have relied on the agreement to protect himself. . . . His breach of the agreement removed that protection. Such a result can hardly be said to undercut the confidence and candor needed for successful and fair plea negotiations. It simply means that once the agreement is finalized its terms will be enforced.

*Id.*

¶38. Analogously, in the case sub judice, McGowan voluntarily entered into a plea agreement and voluntarily entered a guilty plea. The district attorney performed under the agreement as agreed by reducing the capital murder charge to manslaughter and recommending lighter sentences for the other charges, and McGowan reaped the benefit as the trial court accepted the recommendations made by the district attorney's office when sentencing McGowan on his guilty plea. However, following the

reasoning of *United States v. Stirling*, when McGowan subsequently breached the plea agreement by refusing to testify at the later trial of one of his colleagues, he lost the protection under the agreement, and the statements given by McGowan to the district attorney's office should have been allowed into evidence against him.

¶39. One may believe a distinction exists between the agreement entered into by McGowan and the defendant in *Stirling* because the agreement entered into by McGowan and the district attorney's office[(4)] did not include a clause that provided if McGowan breached the agreement any information obtained could be used against him at trial. However, the logic of *Stirling* was adopted by the District of Columbia Circuit Court of Appeals in *United States v. Davis*, 617 F.2d 677 (D.C. Cir. 1979).

¶40. In *Davis*, the defendant similarly entered into a plea agreement and then gave testimony to a Grand Jury. *Davis*, 617 F.2d at 681. However, the defendant's plea agreement did not contain language that such information obtained could be used against him in a later trial if he breached the agreement. *Id.* at 685. The court found that even without such a clause that such testimony should be admissible against a defendant where the defendant breached the agreement. *Id.* at 686. As a matter of policy, the court stated:

> Excluding testimony made after--and pursuant to--the agreement would not serve the purpose of encouraging compromise. Indeed, such a rule would permit a defendant to breach his bargain with impunity: he could renounce the agreement and return to the status quo ante whenever he chose, even though the Government has no parallel power to rescind the compromise unilaterally.

*Id.* at 685 (citing *Santobello v. New York*, 404 U.S. 257 (1971)). Thus, even though McGowan's agreement did not include language that information obtained could later be used, it appears fundamentally fair that such statements given after the plea agreement be admissible.

¶41. Even though statements given after the plea agreement may be admissible against a defendant where the defendant has breached the plea agreement, such statements are not per se admissible, but instead, they must still be voluntarily given. *Id.* at 686. However, McGowan did not raise the issue of voluntariness at the trial court level, and as a result this contention is procedurally barred because a "trial judge cannot be put in error on a matter which was not presented to him for decision." *Howard v. State*, 507 So. 2d 58, 63 (Miss. 1987).

¶42. Although procedurally barred, this Court believes discussion of the issue on its merit is warranted. We have held that in order for a statement to be admissible, "it must have been given freely and voluntarily, and without the influence of promises or threats." *Cabello v. State*, 490 So. 2d 852, 856 (Miss. 1986) (citing *Frost v. State*, 483 So. 2d 1345 (Miss. 1986)). In determining whether statements by an accused are voluntary, an analysis under the totality of the circumstances is required to determine whether the statements were voluntarily and freely made. *Cabello*, 490 So. 2d at 856. At the interview with the district attorney's office, McGowan was told that he did not have to talk to the investigator. Further, McGowan was represented by his counsel at the interview session. In addition, there is no evidence that the statements given by McGowan at the interview was the product of any promise, threat or coercion. Thus, under the test for voluntariness, McGowan's statements were voluntarily and freely given, for no threats or other forms of coercion were used

during the interview.

¶43. In conclusion, this Court finds that the trial court did not err by allowing the statements given by McGowan to the district attorney's office into evidence. In addition, we adopt the view that where a defendant willfully breaches a plea bargain agreement, statements made by the defendant after a valid plea agreement has been entered be admissible at the later trial of the defendant if voluntarily made. As a result, we find this assignment of error to be without merit.

### III. WHETHER THE TRIAL COURT ERRED IN NOT STRIKING FOR CAUSE CERTAIN JURORS.

¶**44.** McGowan asserts that he was denied his constitutional right to a fair and impartial jury pursuant to the 6th and 14th amendments to the United States Constitution and Article 3, § 26 of the Mississippi Constitution of 1890 because the trial court did not strike for cause seven veniremen after individual voir dire. However, at the time McGowan challenged each of the seven potential jurors, McGowan still possessed peremptory strikes that could have been used to strike the potential jurors. This Court has held that:

> [A] prerequisite to presentation of a claim of a denial of constitutional rights due to denial of a challenge for cause is a showing that the defendant had exhausted all of his peremptory challenges and that the incompetent juror(s) was forced to sit on the jury by the trial court's erroneous ruling. *Chisolm v. State*, 529 So. 2d 635, 639 (Miss. 1988). [McGowan] cannot make such a showing in the case at bar because he did in fact strike the veniremen peremptorily. The veniremen in question did not in fact sit on the jury. It is not error for defense counsel to be compelled into using a peremptory challenge to remove a prospective juror.

*Mettetal v. State*, 602 So. 2d 864, 869 (Miss. 1992). As a result, we find that this assignment of error is without error.

### IV. WHETHER THE TRIAL COURT ERRED IN NOT GRANTING MISTRIAL WHEN THE PROSECUTOR ATTEMPTED TO INTRODUCE INFLAMMATORY CHARACTER EVIDENCE MULTIPLE TIMES FOLLOWING THE COURT'S EXCLUSION OF THE SAME.

¶45. McGowan contends that the trial court committed reversible error by failing to grant a mistrial as a result of improper questioning by the prosecutor on cross examination of the defense's witness Faye Hollingsworth. On cross examination, the following exchange took place:

BY MR. PETERS:

Q. Was it your observations of this defendant that he does what he wants when he wants to?

A. Yes, sir.

Q. And that he has absolutely no respect for authority?

BY MR. HOLMES: Your Honor, we're going to object.

BY THE COURT: Sustained. Sustained.

BY MR. HOLMES: Motion for a mistrial.

BY THE COURT: Denied.

BY MR. PETERS:

Q. Ms. Hollingsworth, there is -- if the defendant at the time of giving the statement -- that he was crying when he was giving the statement about this, if he gave one, is it your opinion that the reason he would be crying was because he didn't respect authority?

BY MR. HOLMES: Your Honor, objection.

BY THE COURT: Sustained.

BY MR. HOLMES: It's outside the scope.

BY THE COURT: Sustained, and your motion is denied. Let's move along.

BY MR. HOLMES: Motion for mistrial.

BY THE COURT: I already denied it. Move along.

BY MR. PETERS:

Q. Do you have an opinion based upon your observation of this defendant as to whether or not he was street wise?

BY MR. HOLMES: Objection, your Honor. It calls for a conclusion outside the scope of her authority.

BY THE COURT: Sustained.

BY MR. HOLMES: It's character evidence.

BY THE COURT: Sustained.

BY MR. HOLMES: Motion or (sic) mistrial.

* * *

BY THE COURT: Denied.

BY MR. PETERS:

Q. From your observation of the defendant, was it your observation that although he may have some learning difficulties that his ability to deal with everyday problems exceeded his learning ability?

A. I would say yes, but in some cases.

Q. Okay. In the cases such as we have here; that is, his ability to be street wise regarding crime

and this sort of thing --

BY MR. HOLMES: Your Honor --

BY THE COURT: Sustained. Don't use the word street wise again, Mr. Peters, or I'm going to seriously consider his motion for a mistrial.

BY MR. HOLMES: Which we're making right now.

BY THE COURT: Denied.

¶46. After each question asked by the prosecutor, defense counsel made a contemporaneous objection which was sustained, but the trial court overruled the defendant's motion for mistrial. Defense counsel did not at any time request the trial judge to admonish the jury to disregard the questioning. "It is the rule in this State that where an objection is sustained, and no request is made that the jury be told to disregard the objectionable matter, there is no error." *Marks v. State*, 532 So. 2d 976, 981 (Miss. 1988) (citing *Simpson v. State*, 497 So. 2d 424, 431 (Miss. 1986); *Gardner v. State*, 455 So. 2d 796, 800 (Miss. 1984)).

¶47. McGowan also contends that the prosecutor asked about improper character evidence during the cross examination of Faye Hollingsworth. During cross examination the following took place:

BY MR. PETERS:

Q. And his ability to comprehend and understand weapons, would anything about his learning make him unable to do that?

BY MR. HOLMES: Objection, your Honor. It's outside the scope of her ability.

BY THE COURT: Overruled.

* * *

BY MR. PETERS: Yes, ma'am. Would his learning ability that you observed have anything to do with his ability to understand what a weapon was, what its use was, what its ability to cause harm was, anything such as that?

BY MR. HOLMES: Your Honor, objection on the causing for harm. That's character evidence.

BY THE COURT: Overruled.

¶48. This Court has held that "[t]he relevancy and admissibility of evidence are left, in large part, to the discretion of the trial court." *Johnson v. State*, 666 So. 2d 499, 503 (Miss. 1995) (citing *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990)). "Reversal is proper only where such discretion has been abused and a substantial right of a party has been affected." *Id.* (citing *Green v. State*, 614 So. 2d 926, 935 (Miss. 1992)). In the case sub judice, McGowan sought through the testimony of his teacher to impress upon the jury that he had learning disabilities and was consequently weak-minded. The cross examination sought to elicit the fact that his learning disabilities did not prevent him from knowing exactly what he was doing on the day of the crime.

Thus, it was within the trial court's discretion to determine whether the questioning was relevant. As a result, we find that this assignment of error is without merit.

## CONCLUSION

¶49. This Court finds that the assignments of error presented by McGowan are without merit. Specifically, we find that: (1) statements given by McGowan to the police officers after his arrest were voluntarily, knowingly, and intelligently made; (2) statements made by McGowan to the district attorney's office were admissible against McGowan; (3) the trial court did not err in refusing to strike for cause seven veniremen because McGowan had peremptory challenges remaining; and (4) the trial court did not err in refusing to grant a mistrial. In finding the statements made by McGowan to the district attorney's office admissible, we adopt the reasoning, expressed in *United States v. Stirling,* that where a defendant breaches a plea agreement, statements voluntarily made after entering the plea agreement be admissible at trial against the defendant if the plea is later withdrawn or vacated. As a result, finding that the trial court did not commit reversible error, we affirm McGowan's conviction and sentence.

¶50. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE WITHOUT PAROLE IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. COUNT II: CONVICTION OF ARMED ROBBERY AND SENTENCE OF LIFE IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNT II TO RUN CONSECUTIVELY WITH THE SENTENCE IN COUNT I. COUNT III: CONVICTION OF ARMED ROBBERY AND SENTENCE OF 20 YEARS IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNT III TO RUN CONSECUTIVELY WITH THE SENTENCES IN COUNTS I AND II. COUNT IV: CONVICTION OF ARMED ROBBERY AND SENTENCE OF 20 YEARS IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNT IV TO RUN CONCURRENTLY WITH THE SENTENCE IN COUNT III, BUT CONSECUTIVELY WITH THE SENTENCE IN COUNTS I AND II. COUNT VI AND COUNT VII: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS FOR EACH COUNT IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNTS VI AND VII TO RUN CONSECUTIVELY WITH THE SENTENCE IN ALL COUNTS.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, ROBERTS AND MILLS JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

      **McRAE, JUSTICE, DISSENTING:**

¶51. I disagree with the majority's conclusion that a minor with an I.Q. of fifty-five can knowingly and voluntarily make a confession or enter into a plea bargain agreement. In civil cases, children are

afforded both common law and statutory protection. The majority's argument offers little support for its position. To the contrary, it supports the fact that the defendant here could not have knowingly and intelligently waived anything in this case. The defendant definitely did not have the mental capacity of a twenty-one-year-old, or even an eighteen-year-old. In fact, one of the defendant's teachers testified that his mental capacity was that of a second- or third-grade student. Are we to assume from the majority opinion that second- and third-graders now have the capacity to knowingly and intelligently waive their rights to counsel and make confessions?

¶52. Additionally, minors, considered to be operating under a disability, cannot enter into contracts. Why, then, when constitutionally protected rights and liberty interests are at stake, do we simply look the other way? In particular, when youth and immaturity are combined with intellectual impairment, some safeguards must be provided. I further question how, once a plea bargain has been voided, any "confession" made in reaching that agreement later can be used at trial. For these reasons I dissent.

1. Hollingsworth testified at the trial of this matter also. Johnson did not due to personal reasons.

2. This is not a complete summary of the information contained in the assessment reports. It is, however, demonstrative of the complete findings and is provided for that limited purpose.

3. Rule 11(e)(6) provides as follows:

> Except as otherwise provided in this paragraph, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

Fed. R. Crim. P. 11(e)(6).

4. The agreement provided the following:

> Charlie McGowan understands that the State seeks the complete truth in his/her cooperation, that he/she must cooperate fully and truthfully, and that if at any time it is determined that he/she has given false or incomplete information or testimony, or if he/she refuses to testify or cooperate at any re-trials in the future, then this agreement will be null and void and would automatically reinstate all original charges under the authority of Ricketts v. Adamson, 107 S. Ct. 2680 (1987), including that of capital murder in count 1, for which he would be subject to receive the death penalty. . . .